**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| vs. | ) |
| | ) |
| **ZHEN ZHOU WU, A/K/A ALEX WU,** | ) |
| **YUFENG WEI, A/K/A ANNIE WEI,** | ) |
| **BO LI A/K/A ERIC LEE,** | ) |
| **CHITRON ELECTRONICS, INC., &** | ) |
| **CHITRON ELECTRONICS COMPANY** | ) |
| **LIMITED A/K/A CHI-CHUANG** | )   **CRIMINAL NO. 08-10386-PBS** |
| **ELECTRONICS COMPANY LIMITED** | ) |
| **A/K/A SHENZHEN CHITRON** | ) |
| **ELECTRONICS COMPANY LIMITED** | ) |
| | ) |
| **DEFENDANTS.** | ) |
| | ) |

**DEFENDANTS' MOTION IN LIMINE TO EXCLUDE
TESTIMONY FROM PROPOSED EXPERTS
[With Incorporated Memorandum of Points and Authorities]**

The government has provided the defendant a list of ten witnesses it proposes to proffer as experts. In most instances, the witness will not offer an opinion, but, rather, will provide testimony that will attempt to explain the statutory and administrative schemes under which the export of electronic equipment and components work. These same witnesses, as well as other witnesses, will further opine that particular electronic components are either embraced within or covered by the Commerce Control List ("CCL") or are on the Munitions List and the witnesses will assert that the exportation of such items required licenses before they could be exported to the Peoples Republic of China ("PRC"). The witnesses will further opine that the electronic items were illegally exported to PRC by the defendants.

Defendants Zhen Zhou (Alex) Wu, Yufeng (Annie) Wei, Bo (Eric) Li, and Chitron Electronics, Inc., (collectively the defendants) jointly file this motion in limine and incorporated memorandum pursuant to Local Rule 7.1 to preclude the government from offering in evidence (1) portions of the testimony of the government's "expert" witnesses and (2) certain documents about which several of these witnesses would testify. Because the government's expert disclosures call into question basic assumptions of the defendants' constitutional rights to a fair trial, this memorandum is divided into two parts. The first presents an overview of the law relating to expert testimony, and the second provides an analysis under the Federal Rules of Evidence of the testimony and documentary exhibits that the government anticipates that its "expert" witnesses would offer at the time of trial.

As is explained below, much of the government's proffered expert testimony is inadmissible and should be barred. The witnesses are either not qualified to offer opinions or the topics are not appropriately subject to expert testimony. Moreover, in some instances, the testimony amounts to the sort of summary testimony that undermines the jury's proper role and is highly prejudicial. Finally, even where the testimony might be admissible, the government's notice under Rule 16 is completely inadequate, since it fails to sufficiently provide the basis on which the experts' opinions are based.

## I.   THE DEFENDANTS ARE ENTITLED TO A TRIAL BY JURY

The government's proposed battery of "experts" would deprive the jury of its fact-finding province and the Court of its power and responsibility to state the law. As complicated as this case is, the defendants remain entitled to a trial process that ensures

that the jury will receive their instructions on the law from the Court and return its verdict in accordance with those instructions, not the "opinions" of government "experts."

The government's submissions strike at the very heart of the defendants' constitutional right to a fair trial according to the traditions of the common law. Whether any of the proposed witnesses is an "expert" qualified to offer opinions subject to the constraints of Fed. R. Evi. Rules 702, 703, and 704, those witnesses are not competent to testify concerning the source, construction, or application of the law. Nieves-Villanueva, v. Soto-Rivera, 133 F.3d 92, 99-100 (1st Cir. 1997) ("It is black-letter law that '[i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge.' At least seven circuit courts have held that the Federal Rules of Evidence prohibit such testimony, and we now join them as to the general rule [citations omitted]."); U.S. v. Scop, 846 F.2d 135, 139 (2nd Cir. 1988)(extended discussion of the point; Fed. R. Evi. 704 "Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions.").

A review of the government's disclosure also reveals that the witnesses it denominates as "experts" will be providing background and/or an *overview* of the relevant statutes and administrative provisions.  Such testimony is inadmissible and the witnesses must be excluded.  See United States v. Casas, 356 F.3d 104, 117-24 (1st Cir. 2004).  Moreover, such testimony is inflammatory and its prejudicial effect far outweighs its probative value.[1]  Finally, at the very least, the government has not adequately provided the bases and reasons for the "expert opinion" and, thus, it should be barred.

---

[1]  See United States v. Lopez-Lopez, 282 F.3d 1, 15 (1st Cir.2002) (even appropriate expert testimony under Rule 702 may be excluded under Fed.R.Evid. 403 if its probative value is substantially outweighed by the risk of unfair prejudice it creates.)

## II.   GENERAL STANDARDS FOR ADMISSION OF EXPERT TESTIMONY.

### A.   Daubert and its Progeny

This Court in In re Neurontin Marketing, Sales Practices, and Products Liability

Litigation, 612 F.Supp.2d 116, 131 (D.Mass., 2009) captured the essence of the potential

problems with the admission of expert testimony:

> The Court's vigilant exercise of this gatekeeper role is critical because of
> the latitude given to expert witnesses to express their opinions on matters
> about which they have no firsthand knowledge, and because an expert's
> testimony may be given substantial weight by the jury due to the expert's
> background and approach. See Daubert [v. Merrell Dow Pharmaceuticals,
> Inc., 509 U.S. 579 (1993)] at 595; Kumho Tire, 526 U.S. at 148, (noting
> that experts enjoy "testimonial latitude unavailable to other witnesses");
> United States v. Hines, 55 F.Supp.2d 62, 64 (D.Mass.1999) ("[A] certain
> patina attaches to an expert's testimony unlike any other witness; this is
> 'science,' a professional's judgment, the jury may think, and give more
> credence to the testimony than it may deserve.").

In its ruling, this Court went on to list the recognized standards for the admission

of expert evidence.[2]   First, that admission "is governed by Federal Rule of Evidence 702,

which codified the Supreme Court's holding in Daubert and its progeny."  Neurontin

Marketing, at 130, citing to United States v. Diaz, 300 F.3d 66, 73 (1st Cir.2002) and

Fed.R.Evid. 702 advisory committee's note.

---

[2]   In Kumho Tire, the Supreme Court was careful to emphasize that the trial judge must
exercise her gatekeeping role with respect to all expert evidence, but that how she might
exercise that role would necessarily vary depending on the type of testimony at issue. See
Kumho Tire, 526 U.S. 137 150, 119 S.Ct. 1167; United States v. Frazier, 387 F.3d 1244,
1262 (11th Cir.2004) ( "Exactly how reliability is evaluated may vary from case to case,
but what remains constant is the requirement that the trial judge evaluate the reliability of
the testimony before allowing its admission at trial."); Amorgianos v. Amtrak, 303 F.3d
256, 266 (2d Cir.2002) (recognizing that "the Daubert inquiry is fluid and will
necessarily vary from case to case").

Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier
> of fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.

Moreover, this Court went on to say that "[t]he trial court must determine whether the expert's testimony 'both rests on a reliable foundation and is relevant to the task at hand' and whether the expert is qualified." [citations omitted].  In explicating the point, the Court stated that "[a] proposed expert witness must be sufficiently qualified to assist the trier of fact, and ... his or her expert testimony must be relevant to the task at hand and rest on a reliable basis.... An expert's *methodology* is the central focus of a <u>Daubert</u> inquiry, but a court may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." <u>Id</u>., at 130 (emphasis added) [citations and internal quotations omitted].

In <u>Neurontin Marketing</u>, this Court went on to say that "[b]ecause 'the admissibility of all expert testimony is governed by the principles of Rule 104(a),' the proponents of the expert testimony must establish these matters by a preponderance of the evidence. . . .  'The proponent need not prove to the judge that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable.'" [citations omitted].

**B.      Overview Testimony.**

In <u>United States v. Flores-De Jesus</u>, 569 F.3d 8, 27 (1st Cir. 2009) the Court,

following the holding and rationale of <u>United States v. Casas</u>, 356 F.3d 104, 117-24 (1st

Cir. 2004), indicated that "the practice of having a government agent testify broadly to

summarize facts not yet in evidence in an effort to "paint a picture of guilt before the

evidence has been introduced," (citation omitted), is "inherently problematic."  The Court

of Appeals held that the testimony of a government agent regarding the defendants'

participation in a drug conspiracy was inadmissible hearsay. <u>Id</u>. at 117-18.  In <u>Casas</u> the

admission of such testimony was found to be reversible error because the testimony

sought to establish the ultimate issue in the case before the jury made its own

determination.  *Id. at 120.*  <u>See</u> <u>also</u> <u>United States v. Reyes Guerrero</u>, 638 F. Supp. 2d 117

(D. Puerto Rico 2009).

**1.      The imprimatur problem**

The problem with overview testimony is obvious if the evidence promised by the

overview witness never materializes.  However, even if all of the overview testimony is

corroborated during the course of the trial, there is still the problem with such testimony

that was identified in <u>Casas</u>: "[o]verview testimony by government agents is especially

problematic because juries may place greater weight on evidence perceived to have the

imprimatur of the government." <u>Casas</u>, 356 F.3d at 120; <u>see also</u> <u>United States v. Garcia</u>,

413 F.3d 201, 214 (2d Cir. 2005) (noting that even if the testimony of an overview

witness does prove to be "a summary of later-admitted evidence", it is "generally viewed

as 'improper ... for a party to open its case with an overview witness who summarizes

evidence that has not yet been presented to the jury' " and that "[t]he law already

provides an adequate vehicle for the government to 'help' the jury gain an overview of anticipated evidence as well as a preview of its theory of each defendant's culpability: the opening statement") (quoting 6 Jack B. Weinstein, Weinstein's Federal Evidence § 1006.04[3] ); Avilés-Colón, 536 F.3d at 21 n. 13 (expressing concern about the use of a government agent "to endorse the testimony of other witnesses, who testify from personal knowledge about the involvement of the defendant in the conspiracy, and thereby add the imprimatur of the government to those witnesses' testimony"). The overview testimony of a law enforcement official is not simply a repetition (at best) of other evidence. It is also, in effect, an endorsement of the veracity of the testimony that will follow. Garcia, 413 F.3d at 213 (noting that an overview witness did more than simply summarize the trial testimony; in addition, he "told the jury that ... an experienced DEA agent[ ] had determined, based on the total investigation of the charged crimes, that [the defendant] was a culpable member of the conspiracy").

## 2.    Overview Testimony – <u>Crawford</u> Problems.

Overview testimony may also have serious Crawford /Confrontation Clause implications. In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court held that a declarant's "testimonial" out-of-court statement is inadmissible under the Confrontation Clause unless "(1) the declarant testifies ... or (2) the defendant had a prior opportunity for cross examination and the declarant is unavailable ... or (3) the evidence is admitted for purposes other than establishing the truth of the matter asserted." United States v. Maher, 454 F.3d 13, 19-20 (1st Cir.2006). Therefore, "[p]ost- Crawford, the admission of non-testifying informants' out-of-court testimonial statements, through the testimony of police officers, is a recurring issue in the courts of appeals." Id. at 19.

Overview testimony frequently reflects reliance on the statements of non-testifying

informants and individuals that are used as a basis for the witnesses' testimony.  The

problematic nature of such testimony is self-evident. Finally, and more generally, such

overview testimony is almost certain to be rife with hearsay. <u>Rodríguez</u>, 525 F.3d at 96

(overview testimony also "constituted improper hearsay testimony"). While the

subsequent trial testimony of the out-of-court declarant or the introduction of the facts

and documents on which the testimony is based might resolve the <u>Crawford</u> issue, which

is based on the Confrontation Clause, it does not cure the hearsay problem more

generally.

C.      **Rule 16 – Providing the Bases for the Experts' Opinion.**

The pertinent portion of Rule 16 says:

(G) Expert witnesses.--At the defendant's request, the government must
give to the defendant a written summary of any testimony that the
government intends to use under Rules 702, 703, or 705 of the Federal
Rules of Evidence during its case-in-chief at trial. If the government
requests discovery under subdivision (b)(1)(C)(ii) and the defendant
complies, the government must, at the defendant's request, give to the
defendant a written summary of testimony that the government intends to
use under Rules 702, 703, or 705 of the Federal Rules of Evidence as
evidence at trial on the issue of the defendant's mental condition. The
summary provided under this subparagraph must describe the witness's
opinions, the *bases and reasons for those opinions*, and the witness's
qualifications.

Fed. R.Crim P. 16 (emphasis added)

As the Advisory Committee explained, the bases and reasons underlying the

expert opinion is perhaps "the most important" expert disclosure to be provided.  <u>See</u>

Advisory Committee Notes to the 1993 Amendments; <u>see also</u> <u>United States v. Jasper</u>,

No. 00 CR. 825(PKL), 2003 WL 223212, at *3 (S.D.N.Y. Jan. 31, 2003) ("[T]he

Advisory Committee emphasized that the most important aspect of this mutual discovery obligation is the provision of a summary of the bases of the expert's opinions.").

The Defendants have asked for the documents and other facts on which the proposed experts relied to form their opinions.  The government has provided a sparse amount of information.  Rule 16 plainly requires that such information be disclosed.  *See* Fed. R. Crim. P. 16(a)(1)(G) (requiring government to "describe … the bases and reasons" for the proffered expert opinions); see also United States v. Barile, 286 F.3d 749, 758 (4th Cir. 2002) (holding defendant's letter did not give proper notice to government under Rule 16(b)(1)(C) because, in failing to give reasons for the opinions, it lacked specificity).  Here, where the subject of the purported expert testimony turns on technical rules and documents to which the defendants do not have public access, the government should have provided a detailed disclosure so as to enable the defendants to understand the substance of the opinions.  See United States v. Wilkerson, 189 F.R.D. 14, 16 (D. Mass. 1999) (noting that "the extent of detail required by Rule 16(a)(1)(E) will depend on the nature of the expert testimony," with technical contexts requiring greater disclosure, and directing the government to provide a "rather detailed summary"); Jasper, 2003 WL 223212, at *3 n.3 (explaining that courts have read the "written summary" requirement of Rule 16 broadly, "particularly when it comes to the description of the bases and reasons for the expert's opinions"); see also Yoon, 128 F.3d at 526 (finding government had fulfilled its disclosure obligations when it, among other things, tendered to the defense copies of a transcript from an unrelated trial in which the agent had previously testified as to the methodology and bases he uses for analyzing check-kiting).

The defendants submit that Rule 16 is not limited to "opinion" testimony.  The government's disclosure obligation under Rule 16 is triggered, in part, by Federal Rule of Evidence 702.  See Fed. R. Crim. P. 16(a)(1)(G) ("[T]he government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial.").  Rule 702 contemplates that expert testimony may be presented in forms other than opinions: "a witness qualified as an expert … may testify … in the form of an opinion *or otherwise*."  Fed. R. Evid. 702 (emphasis added).  Accordingly, the fact that the government's proposed witnesses may offer non-opinion testimony[3] does not excuse the government from Rule 16's disclosure obligations.  In the instant matter, the government has not provided *bases and reasons for* the testimony or opinion the proposed expert witnesses will testify about.

### D.    Expert Testimony of the Scope and Meaning of the Law is Inadmissible.

Many of the listed topics for the respective expert witnesses are not properly the subject of expert testimony.  The First Circuit plainly prohibits such expert testimony about the applicable law:

> It is black-letter law that it is not for witnesses to instruct the jury as to applicable law, but for the judge….Accordingly, expert testimony on such purely legal issues is rarely admissible….The danger is that the jury may think the 'expert' in the particular branch of the law knows more than the judge-surely an impermissible inference in our system of law….Because the jury does not decide such pure questions of law, such testimony is not helpful to the jury and so does not fall within the literal terms of Fed. R.

---

[3]   Because the government has disclosed nothing more than a list of "terms and concepts" for which the government's witnesses will provide either  "definitions and/or explanations," it is impossible to discern the form – opinion, non-opinion, or some combination – that each respective witnesses' testimony will necessarily take.  Even so, it is hard to believe that *none* of the various witnesses' "explanations" of a "term" or "concept" would be wholly free of opinion.

Evid. 702, which allows expert testimony '[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine fact in issue.'…Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect…because the judge's expert knowledge of the law makes such assistance at best cumulative, and at worst prejudicial.

Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99-100 (1st Cir. 1997) (internal quotation marks and citation omitted).

## III.   THE APPLICATION OF THE LAW TO THE GOVERNMENT'S PROPOSED EXPERT WITNESSES/TESTIMONY.

### A.   BRIAN BAKER

1.   *Government's Proffer*

According to the governments Expert Notification, Mr. Baker is the Deemed Export and Electronics Division Director in the Office of National Security and Technology Transfer Controls at the U.S. Department of Commerce.  In support of qualifying Mr. Baker as an expert, the government says that he has worked on national and international efforts to change export controls on dual-use commodities to address national security concerns, processed license applications, and made license determinations. Prior to working at the Department of Commerce, Mr. Baker held various engineering and engineering management positions during his 22 year tenure at IBM.  As the bases for Mr. Baker's opinions, the government states "Mr. Baker's testimony will be *based* on his academic and professional training, professional expertise, *research*, and *review of the manufacturer's datasheets*/specifications pertaining to the parts at issue in this case."  Government Notification, p. 3 (emphasis added)

Mr. Baker is expected to *generally describe* the Export Administration Regulations ("EAR"), the Commodity Control List, Export Classification Control

Number ("ECCN") 3A001, and U.S. Department of Commerce's Entity List.  He will

testify that (1) the EAR place limitations on the export of those goods and technology

that the Secretary of Commerce deems could make a significant contribution to the

military potential of other countries, could prove detrimental to the national security of

the United States, or are contrary to the foreign policy of the United States.

Mr. Baker will further testify that (2) the EAR controls exports and re-exports of

"dual-use items".  He will define "dual-use items" as commercial items that also have a

military or nuclear proliferation application, to foreign countries.

Mr. Baker will also testify that (3) with limited exceptions, the EAR prohibit any

person from exporting or causing the exportation from the United States of dual-use

items designated as ECCN 3A001, which are controlled for national security reasons, to

the People's Republic of China ("PRC"), without having first obtained an export license

from the U.S. Department of Commerce and that (4) although Hong Kong became a

territory of PRC in 1998, Hong Kong is treated as separate country from China under

U.S. export laws and regulations.

### ***Defendants' Position***

All of such testimony concerning exporting of "dual-use" items to the PRC that

would be proffered through Mr. Baker are in the nature of an overview of the statutes and

regulations, a primer on the law, and Mr. Baker's legal opinion of the meaning and

breadth of the laws and administrative regulations.   Under either circumstance – as an

overview or as an opinion of the law -- his testimony would be inadmissible.  See Nieves-

Villanueva and Casas set out at paragraphs II B & D above.

Further, his testimony is irrelevant and highly prejudicial.  The rationale or policy behind the adoption and present application of the EAR is irrelevant and has the real potential to prejudice the defendants.  In light of the intense media attention on terrorism and threats from foreign countries, linking the export controls to "military potential of other countries" or nuclear proliferation and that the breach of such controls "could prove detrimental to the national security of the United States" implicates the safety of United States citizens and the jurors themselves and is highly inflammatory and prejudicial. Such testimony, even if relevant, must be excluded pursuant to  Rule 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.")

### *Further Baker Testimony*

Mr. Baker will also testify (5) that each of the parts named in paragraphs 25-28 and 43 of the Introductory Allegations of the Second Superseding Indictment are classified under ECCN 3A001 and (6) that each of the said items classified under ECCN 3A001 required a license from the Department of Commerce to export to the PRC.  He will also testify that (7) during the applicable time periods there was no exception to this license requirement for exports to the PRC.

### *The Defendants' View*

This testimony should also be barred.  Such determination of what ECCN number has been, or should be, ascribed to a particular item is a factual question that can be determined by the jury itself by factually and logically progressing through a series of

13

steps set forth in the Administrative Regulations.  Allowing Mr. Baker to render an

"expert opinion" obviates the jury's need to make the factual determination.  Having Mr.

Baker provide the ultimate conclusion – and thus usurp the fact finding function from the

jury -- without providing the methodology he used and providing the documents he used

to reach his conclusion is improper.

Furthermore, Mr. Baker's testimony on these matters is inadmissible as expert

opinion because the government's notice is inadequate under Rule 16.  The expert

disclosure requirement, added to Rule 16 in 1993, is "intended to minimize surprise that

often results from unexpected expert testimony, reduce the need for continuances, and to

provide the opponent with a fair opportunity to test the merit of the expert's testimony

through focused cross-examination."  Fed. R. Crim. P. 16 Advisory Committee Notes to

the 1993 Amendment; see also Wilkerson, 189 F.R.D. at 16 (applying spirit of the

Advisory Committee Notes and Rule 16 case law to require "rather detailed" expert

disclosure).  These expert disclosures are also necessary in order for the court to properly

exercise its "gatekeeping" function under Fed. R. Evid. 702.  See generally Daubert v.

Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Rule 16 authorizes a court to

preclude a witness from offering expert testimony where the proponent of the witness

fails to comply with Rule 16's disclosure requirements.  See Fed. R. Crim. P.

16(d)(2)(C).[4]

---

[4]  For cases requiring disclosure of predicate facts and information under Fed. R. Crim. P.
16, see, e.g., Capleton, 199 F.R.D. at 28 (ordering government to "police its own
compliance with the disclosure requirements of rule 16(a)(1)(E)," but, at a minimum, to
disclose, among other items, "*underlying data* relied upon by [the agent-expert] when
forming his opinion" and "copies of any summaries prepared by [the agent-expert] as a
result of his analysis of the case") (emphasis added); United States v. Sourlis, 953 F.
Supp. 568, 580-81 (D.N.J. 1996) (ordering that defendants produce additional
information regarding defendant's polygraph expert's proposed testimony, including the
charts made during the examination and a list of the control questions and directed lie

### *More Baker Testimony*

Mr. Baker will further say that (8) beginning in 1997, the U.S. Department of Commerce began publishing and maintaining the "Entity List" and that (9) the Entity List is a listing of foreign end-users (businesses, individuals, research institutions, governments,  and private organizations) that are subject to specific license requirements for the export of specified items.  Mr. Baker will testify that (10) the U.S. Department of Commerce has determined that the end-users on its Entity List present an unacceptable risk of diversion of U.S. technology to develop weapons of mass destruction or have engaged in activities that are contrary to U.S. national security and/or foreign policy interests.  Mr. Baker will state that (11) on May 29, 1999, the U.S. Department of Commerce added Shanghai Academy of Spaceflight Technology to its Entity List and (12) since May 28, 1999, any export of U.S. commodities that have an ECCN other than EAR99 to Shanghai Academy of Spaceflight Technology required an export license from the U.S. Department of Commerce.

### *The Defendants' View*

Mr. Baker's testimony as to why a particular entity is put on the Entity List by the Commerce Department is irrelevant.  Moreover, it is prejudicial and its probative value is

---

questions asked, in accordance with defendants' discovery obligations under Rule 16(b)(1)(C)); United States v. Liquid Sugars, Inc., 158 F.R.D. 466, 471-72 (E.D. Cal. 1994) (under former version of Rule 16, requiring disclosure of data and reports underlying expert test results, reasoning that "it is unreasonable to expect defense counsel to be able to delve into technical aspects of that methodology/data on the spot at trial"). For cases explaining that advance disclosure of underlying facts and data is required by FRE 703, 704 and 705, which permit an expert to testify at trial without stating the basis for his or her opinion, but allow the underlying facts to be addressed and challenged on cross-examination, and thus have the combined effect of placing the burden of exploration of the facts and assumptions underlying the expert testimony squarely on the shoulders of opposing counsels cross-examination, see Smith v. Ford Motor Co., 626 F.2d 784, 793 (10th Cir. 1980); The Herrick Co. v. Vetta Sports, Inc., No. 94 CIV. 0905(RPP), 1998 WL 637468, at *3 (S.D.N.Y. Sept. 17, 1998).

far outweighed by its prejudicial and inflammatory effect.  Mr. Baker should be

foreclosed from testifying that "the U.S. Department of Commerce has determined that

the end-users on its Entity List present an unacceptable risk of diversion of U.S.

technology to develop weapons of mass destruction or have engaged in activities that are

contrary to U.S. national security and/or foreign policy interests".  See Rule 403.

Moreover, the proposed testimony that a license was required for shipments to the

Shanghai Academy of Space Flight Technology is not a proper subject of expert opinion.

### *More Baker Testimony*

Mr. Baker will also testify that (13) Xilinx device bearing part number

XC2V30004FG676C is classified under ECCN 3A001 and Xilinx device bearing part

number XCF32V048C is classified under ECCN 3A991 (controlled for antiterrorism

reasons) and (14) as a result of Shanghai Academy of Spaceflight Technology being

designated on Commerce's Entity List, the export of said Xilinx parts required an export

license from the Department of Commerce and failure to obtain a license prior to

exporting these items from the United States violated the EAR.

### *The Defendants' Position*

As set out above, what ECCN numbers are or should be ascribed to the Xilinx

items is a factual question that must be left to the jury.  Additionally, and more

problematic, the government has not produced one document or piece of evidence to

establish how Mr. Baker arrived at his opinion/conclusion of the ECCN numbers of these

items.  Nothing has been provided to the Defendants to determine the methodology used

by Mr. Baker to arrive at this opinion.  Therefore, Mr. Baker must be foreclosed from

testifying and providing his opinion on the ECCN numbers for the Xilinx items for the

government's failure to comply with the mandates of Rule 16.  Moreover, the proposed

testimony that one of these items was "controlled for antiterrorism reasons" is both

misleading and inflammatory.

That the government may proffer Mr. Baker to provide "background" of the

alleged relevant laws and regulations does not negate the expert nature of his testimony.[5]

In fact, courts routinely find "background" testimony, such as industry custom and

practice testimony, to be expert in nature and accordingly subject the proponents of such

testimony to the rules of disclosure and admissibility applicable to expert testimony.[6]

## B.    DAVID PORTS

### *The Government's Proffer*

The government anticipates that Mr. Ports will testify that: (1) M/A-Com Power

Amplifiers bearing part numbers MAAPGM0034 and MAAPGM0038 provide

broadband signal amplification and are primarily used in military phased array radars.

---

[5]   Indeed, the government presumably intends to offer Mr. Baker's testimony, as Rule 702 contemplates, to "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.

[6]   See Bank of China, 359 F.3d 171, 182 (2d Cir. 2004),  ("Huang's explanations regarding typical international banking transactions or definitions of banking terms … were improperly admitted….before such testimony could have been proffered pursuant to Rule 702, Bank of China was obligated to satisfy the reliability requirements set forth in that Rule, and disclose Huang as an expert pursuant to Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure."); Bransford & Petz, No. Civ.A.2003-11466-NG, 2005 WL 166824, at *9 (D. Mass. 2005) ("[A]ny testimony offered by him regarding custom and practice in the collections industry or the provisions of the Commercial Law League of America's Guide, their interpretation and application, is inadmissible under Rule 701."); Victor G. Reiling Assoc. and Design Innovation, Inc. v. Fisher-Price, Inc., No. 3:03 CV 222 (JBA), 2005 WL 3542907, at *2 (D. Conn. Dec. 14, 2005) (noting "expert testimony is necessary for the introduction of any custom and practice evidence" and striking testimony opining on the custom and practice in the toy industry) (quotation marks and citations omitted); Chen v. Mayflower Transit, Inc., 224 F.R.D. 415, 418-19 (N.D. Ill. 2004) ("[T]here is no doubt that … testimony [as to industry terminology] falls under Rule 702's category of 'specialized knowledge'" and excluding under Rule 701 "broad general statements and opinions about the laws, regulations and practices of the industry").

Mr. Ports will explain that phased array radar is critical to the defense of the U.S. military and in his opinion, is the most important system on aircraft.

Phased array radar is used in defensive and offensive military operations. The M/A Com Amplifiers bearing part numbersMAAPGM0034 and MAAPGM0038 are also used in point-to-point radio systems, high-speed transmission lines using fiber optics, and airborne radar (2) M/A Com Phase Shifters bearing part numbers MAPCGM0001, MAPCGM0002, MAPCGM0003, and MAPCGM0004- DIE have primary applications in electronic warfare, phased array radar, and satellite communications (3) Velocium High Power Amplifier bearing part number APH502 are sensitive military parts with primary applications in military radar, fire control, and military guidance systems- (including missile guidance systems), and control equipment (4) Amplifonix Amplifiers bearing part number TM-9318 are used in military communications systems [5] Rad Hard Syncronous Rectifiers bearing part number IRHSNA57064D are specifically designed for space applications and used primarily in military satellite systems including global positioning systems.  They are also used in a variety of other military applications including flight controls for military aircraft.

### *The Defendants' Position*

Assuming a proper foundation, Mr. Ports may properly testify as to whether a particular item (for example, a particular model of power amplifier) has the technical requirements that are specified in a particular subcategory of the USML.  That is, if the government first makes the appropriate disclosures as to the bases for this testimony. Beyond that, his testimony about military uses, including but not limited to his opinion that phased array radar is "critical to the defense of the U.S. military and in his opinion is

the most important system on aircraft," goes beyond the scope of appropriate expert testimony and is inflammatory, prejudicial and not probative.  All testimony of this nature should be excluded.

## C.    ALFRED COURDUFF

### *Government's Proffer*

Mr. Courduff will testify about the charged Commerce Controlled Commodities (set forth in paragraphs 25-28 of the Introductory Allegations of the Second Superseding Indictment). He will describe these parts (what they do, how they work, etc.), their primary military applications, and why each of these parts are controlled for export.

The government anticipates that Mr. Courduff will testify that: (1) Digital-to-Analog Converters bearing part numbers CA3338AD1 AD660SQ/883B1 and ADS5463IBPFBTl and Analog-to-Digital Converters bearing part numbers AD565ATD, AD574ATD1 AD6645SQ-105, AD6645ASQ-80, AD7760BSVZ, AD9245BCP-80, AD9433BSQ-125-ND, ADC08D15OOCIYB/NOPB, ADS161OIPAPT, ADS5463IPFP, ADS8411IBPFBT, LTC2242IUP-12#PBF, THS1403IPFB1 and THS1408IPFB are used in the following military applications: military radar, electronic warfare (surveillance, counter-measures, etc.), military information display systems, military command and control functions for aviation, naval, and ground operations, and military communications systems.

Mr. Courduff will further testify that "[t]hese parts are controlled for export based upon their performance characteristics (bit resolution and sampling rate) or their ability to operate at military temperate ranges."  He will testify that "[f]or instance, Digital-to-Analog Converters bearing part number CA3338AD and Analog-to-Digital Converters

bearing part number AD574ATD operate at military temperature ranges and therefore are used in aerospace applications; (2) Power Amplifiers bearing part number MAAPGM0021 and ALH102C are used in the following military applications: military radar, military communications, electronic warfare (surveillance, counter-measures, etc.), satellite and radio communications, and military phased array antennae systems; and (3) Programmable Array Logic Devices bearing part numbers 5962-8984102LA, 5962-8983903RA, and Memory Microcircuits bearing part number 5962-8959820MZA, which are used in conjunction with Programmable Array Logic Devices, are used in the following military applications: missile and space systems (including launching systems, guidance systems, and long range detection of aircraft and missiles), naval navigation, and phased array radar."

In its first supplemental disclosure letter, the government states that Mr. Courduff will also testify, without limitation, about the charged Commerce Controlled Commodities set forth in paragraphs 42 and 43 of the Introductory Allegations of the Second Superseding Indictment. He will describe these parts (what they do, how they work, etc.), their primary military applications, and why each of these parts is controlled for export. More specifically, the government anticipates that Mr. Courduff will testify that: (1) Xilinx device bearing part number XC2V30004FG676C, which is classified under ECCN 3AOOl, is a Virtex 2 series Field Programmable Gate Array with reconfigurable and customization capabilities. In other words, a user can take this device and load it into their configuration program saving money and protyping time. In Mr. Courduff's opinion, this part is very sophisticated and far exceeds the minimum threshold for export controls. These Xilinx devices arc used in numerous military applications

including missile systems, aerospace applications, fire control systems, military communications, x-ray imaging (explosive detection and inspection of rocket motors), and cryptography and decryption.  (2) Xilinx device bearing part number XCF32V048C, which is classified under ECCN 3A991, is a high capacity memory circuit which is mounted on a circuit board and can be directly inserted into a pre-existing system. It is controlled because of its capabilities in missile systems.  Its military applications include missile guidance systems, short range missile systems, gunnery systems (fire control systems), and military communications.

### *Defendants' Position*

As with Mr. Baker and Mr Ports, this testimony exceeds the boundaries of permissible expert testimony.  With a proper foundation, Mr. Courduff may properly testify as to whether a particular item has the technical requirements that are specified in a particular subclassification of the CCL, but not regarding its military applications or uses and not as to his opinion as to why it is controlled for export.  His proposed testimony, for example, that one part "is very sophisticated and far exceeds the minimum threshold for export controls" and any other similar testimony should be barred, and his proposed testimony that another part is "controlled because of its capabilities in missile systems" is both prejudicial and misleading.  Also, the government has provided an inadequate notice under Rule 16 regarding the basis for the opinions that Mr. Courduff would render.

D.     **JAMES KRUSHAT**

***Government's Proffer***

Mr. Krushat will provide a general overview of the PRC's Military Industrial

Complex and explain that China's defense industry is comprised of 11 state-owned

enterprises, which have been involved in the production of military goods for the

People's Liberation Army ("PLA"). These enterprises cover the areas of nuclear affairs,

aerospace, aviation, shipbuilding, ordnance, and electronics.

The state-owned enterprise involved in producing military electronics is China

Electronics Technology Group Corporation ("CETC"). He will testify that the CETC is

made up of numbered research institutes with various specialties, which each to a varying

degrees provide support to PLA/Chinese military.

Although many of these Research Institutes claim to have both a military and

civilian commercial division, in Mr. Krushat's opinion, the civilian divisions were

created, in large part, to procure U.S. controlled dual-use technology for the PLA and

generate money through civilian projects to fund research and development for military

projects.

Mr. Krushat will describe the PRC's formal policies implemented to improve the

modernization of its military in the 1990s. Mr. Krushat will explain that the PRC's efforts

and desire to steal and illegally procure U.S. technology accelerated in 1996 when PRC's

communist leaders announced the "Super 863 Program" to acquire and develop science

and technology through the year 2010. The program calls for the acquisition and

development of technology in a number of areas of military concern: machine tools,

electronics, petrochemicals, electronic information, bioengineering, exotic materials,

nuclear research, aviation, space, and marine technology. Mr. Krushat will further testify that in 1997, the PRC communist leaders formally codified the "16-Character Policy." This policy provides the overall direction that blurs the lines between government, commercial and military entities. The sixteen characters literally mean: Combine the military and civil Combine peace and war Give priority to military products Let the civil support the military. More specifically, Mr. Krushat will testify about four of CHITRON-SHENZHEN's military customers, the 13th, 15th, and 41st Research Institutes of the CETC and the Shanghai Academy of Spaceflight Technology, and provide examples of their military projects. He is expected to testify that in his opinion each one of these Research Institutes is a Chinese military related entity.

Mr. Krushat will testify that the 13th Research Institute: (1) has been designated the National Defense Science and Technology Laboratory of Gallium Arsenide Ultra-High Speed Integrated Circuit and Power Devices and houses the State Quality Inspection and Testing Center of Semiconductor Products; (2) its major products include the development of integrated circuits for military and commercial purposes; (3) has developed Gallium Arsenide integrated circuits and discrete products for 2-to 4-GHz band used in airborne early-warning phase-array radars and tactical communications satellites; and (4) its military electronics research and development efforts are designed to develop numerous high-performance, highly-reliable, and powerful electronic technical equipment and for increasing its efforts in the area of system integration.

Mr. Krushat will testify that the 15th Research Institute: (1) is known as the North China Computer Technology Research Institute; (2) designs, develops, and produces advanced computer systems for China's national defense; (3) it has participated in tests of

Chinese atomic and hydrogen bombs and engineered the measurement and control system for the launch of the first Chinese Intercontinental Ballistic Missile into the Pacific Ocean as well as for a submarine-launched ballistic missile; and (4) its primary defense mission is to produce and maintain defense survey and control systems (including systems used for satellite communications, satellite launch operations, and the tracking and forecasting of movements of satellites, missiles, and other space vehicles).

Mr. Krushat will testify that the 41st Research Institute: (1) provides testing and measuring equipment for radars and satellites to the PLA; (2) specializes in research in electronic microwave, millimeter wave, and photo-electronic measuring devices; and (3) develops intelligent microwave millimeter-wave vector network analyzers (electronic measurement devices used in modern microwave, integrated circuit and computer technologies) that are primarily used in military and production fields, radar, electronic counter-measures, microwave communications, aviation, and aerospace research.

Lastly, Mr. Krushat will testify that the Shanghai Academy of Spaceflight Technology: (1) is also known as the 8th Research Academy; (2) is one of the seven design academies that constitute the China Aerospace Science and Technology Corporation; (3) is involved in the design, development, and manufacture of space launch vehicles, tactical missiles, carrier rockets, and satellite systems; (4) is also involved in work on components and instruments for rocket inertial guidance and stabilization systems; and (5) as a result of its proliferation activities, the Shanghai Academy of Spaceflight Technology was placed on the Department of Commerce's Entity List on May 28, 1999.

In its second supplemental disclosure letter, the government very recently stated

that Mr. Krushat will also testify that the first five institutes listed on a Chitron document entitled "Selected Honorable Clients of Chitron Electronics" are Chinese military related entities.  Mr. Krushat will also provide a description of these entities to the jury.  The government anticipates that Mr. Krushat will testify, in general, that: (1) the 14th Research Institute of the China Electronics Technology Corporation is one of the largest electronics research institutes in China which military products include precision-instrumentation radar for missile range operations, ground-based air defense radar, surface, ship, and airborne radar, and military satellite systems; (2) the 54th Research Institute of the China Electronics Technology Corporation completed large scale electronics projects in support of China's atomic bomb, hydrogen bomb, and satellite programs and its primary research areas include satellite communications, radar, and electronic warfare. As a result of its proliferation activities, the 54th Research Institute was placed on the Department of Commerce's Entity List on May 14, 2001; (3) the 723rd Research Institute of the China Shipbuilding Industry Corporation is primarily involved in the research and development of naval electronic confrontation and radar systems; (4) the 726th Research Institute of the China Shipbuilding Industry Corporation has been involved in the research and development of underwater acoustic countermeasures and underwater acoustic navigation among other projects; and (5) the 2nd Research Academy of the China Aerospace Science and Industry Corporation is China's premier research and development organization for tactical and strategic missiles (including submarine launched, land-based ballistic missiles, and surface-to-air missiles), sensors, electronics (including air and missile defense and radar systems), and large-scale system engineering.

In addition, Mr. Krushat will testify that the 29th Research Institute, to which defendants YUFENG WEI and CHITRON-US, shipped more than $8,000 worth of voltage oscillators in May 2005 but WEI fraudulently identified the ultimate consignee was located in Hong Kong on the Shipper's Export Declaration: (1) is primarily responsible for the development of the PLA's electronic counter-measure systems (i.e., electronic signal jamming equipment); (2) is involved in the design, development, and production of high-tech electronic systems and equipment for the Chinese military, including airborne self-protection systems, synthetic aperture radar, stand-off jammers, radar warning receivers, electronic intelligence systems, vehicle navigation, monitoring, and control systems, signal intelligence systems, anti-radiation missile decoys, electronic countermeasures simulators, and reflector antennas for stealth technology.

The government states that "Mr. Krushat's testimony will be based on his academic and professional training, professional expertise, research, and review of documents and records pertaining to CHITRON-SHENZHEN's customers obtained from the search warrants executed in this investigation."

### *Defendants' Position*

The defendants have not been provided with the bases on which Mr. Krushat's opinions are based.  For that reason alone, his testimony should not be admitted.  See Rule 16.  More fundamentally, the whole point of his testimony is to convince the jury that the defendants' alleged customers were hostile and inimical to the national security of the United States.  This entire testimony is not probative and not the proper subject of expert opinion.  It is also highly inflammatory, and its prejudicial impact clearly outweighs any possible probative value.

Further, if the government is proffering Mr. Krushat as an overview witness, then his testimony is analogous to the testimony at issue in <u>Bank of China, New York Branch v. NBM LLC</u>, 359 F.3d 171 (2d Cir. 2004), the admission of which the Second Circuit held to have been in error.  There, the district court admitted a Bank of China employee's testimony: (1) that certain transactions did not comport with the business community understanding of normal, true, trade transactions between a buyer and a seller; (2) the concept of a "trust receipt" and how it works in the context of an international commercial transaction; and (3) that it is considered fraud when an importer presents a trust receipt to a bank to obtain a loan knowing that there are no real goods involved.  359 F.3d at 180.  The Second Circuit found the district court abused its discretion when, under Fed. R. Evid. 701, it admitted this testimony, which was based not on the employee's personal perceptions, but on his experience and specialized knowledge in the banking industry.  <u>Id</u>. at 181.  In the court's view, the proponent of this testimony had evaded Fed. R. Civ. P. 26's disclosure requirements and Fed. R. Evid. 702's reliability requirements "'through the simple expedient of proffering an expert in lay witness clothing.'"  <u>Id</u>. (quoting Fed. R. Evid. 701, Advisory Committee Notes to 2000 Amendments).

Mr. Krushat's statement that Annie Wei "fraudulently identified the ultimate consignee was located in Hong Kong on the Shipper's Export Declaration" for items allegedly shipped to the 29th Research Institute is not proffered as an opinion but as a statement of fact – a factual determination that is solely within the province of the jury. If offered as an opinion, the government has failed to set out the basis for Mr. Krushat's opinion as required by Rule 16.

In a similar fashion, Mr. Krushat's statements about the primary responsibility of the 29th Research Institute and the types of products it allegedly produces lacks any foundation and the government fails to provide the basis on which Mr. Krushat's statements are made. These statement must be excluded because of the government's refusal to provide any discovery of the bases used by Mr. Krushat to make such statements or opinions.

E.      RONALD GUERIN

*Government's Proffer*

Mr. Guerin will testify that since the 1990s, the PRC has been increasingly focused on acquiring U.S. technology, particularly military and dual-use technology, that can be integrated into the PRC's military and industrial bases. He will describe the methods used by the PRC to acquire U.S. military and controlled dual-use technologies. Mr. Guerin will explain that the PRC uses a variety of approaches to acquire U.S. military technology including, but not limited to: illegally transferring U.S. military technology from third countries; exploiting dual-use products and services for military applications; illegally diverting dual-use technology to military purposes; using front companies (i.e., corporations set up by PRC nationals overseas to conduct technology acquisition and transfer) to illegally acquire technology; and using commercial enterprises and other organizations as cover for technology acquisition.

The government anticipates that Mr. Guerin will also describe how the PRC government acquires U.S. technology. He will explain that the PRC government assembles shopping lists of U.S. parts, commodities, or information and distributes those tasking lists to companies or persons, which have been determined to be reliable and

trustworthy. Frequently, the PRC government sends the same tasking list to several technology brokers. Mr. Guerin will testify that numerous PRC front companies operate in the United States (technology acquisition companies set up by PRC nationals to procure U.S. commodities for the PRC government).

He will describe the characteristics of a front company (i.e., run by a small number of PRC nationals, set up in a family home, procurement of U.S. commodities for PRC entities based upon tasking lists sent from the PRC, concealment of end-users in the PRC, transshipment of U.S. commodities through Hong Kong, falsification of Shipper's Export Declarations, etc.). Mr. Guerin will testify that in his opinion CHITRON-US is a front company established to procure U.S. commodities for the PRC government.  Lastly, Mr. Guerin will testify that the largest and primary customer of electronics in the PRC is the Chinese military.

### ***Defendants' Position***

Mr. Guerin's testimony should be precluded, because there is no foundation shown for his expert testimony, and in any event it is inflammatory, and it is prejudicial rather than probative.

The bases for Mr. Guerin's opinion is described in only the most general terms – it will not be based on classified information.  But, that hardly comports with Rule 16 and provides a suitable foundation.  Moreover, given the overtly prejudicial nature of this proposed testimony, it should not be permitted absent a showing of relevancy and materiality to a necessary element of the government's proof.  Finally, the story Mr. Guerin seeks to weave, that Chinese companies are set up to illegally procure U.S.

military items, is not "expert" testimony.  It is designed to use guilt by association to prejudice the jury.

F.     **MARK J. RICCIO**

### *Government's Proffer*

Mr. Riccio will testify regarding the field of geographic information and analysis, including the determination of distances using satellite imagery. He will testify about the close proximity between CHITRON's Shenzhen and Hong Kong offices using images prepared by the National Geospatial-Intelligence Agency ("NGA"). Mr. Riccio will testify about the preparation of these images and explain the information contained in each image.

### *Defendant's Position*

The defendants say that Mr. Riccio's expert testimony is irrelevant and immaterial and the government should be foreclosed from presenting the satellite imagery and the distance calculations.  Pursuant to Rule 401 "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.  The issue in question is not the distance between Hong Kong office and the offices in Shenzhen, but whether one office was in Hong Kong and the other in the PRC. Whether the offices were 10,000 miles apart or merely a mile apart would not affect that necessary issue and the testimony and satellite photos would do nothing to aid the jury in making the determination that each office was in a different location, i.e., different country for the purposes of the CCL or Munitions List.

If the purpose of the testimony is to establish the close proximity of two locations to raise and support an inference that there is no shipping advantage to ship to Hong Kong as compared to Shenzhen – and therefore the reason for shipping to Hong Kong could only have a nefarious purpose -- then the testimony would be misleading and lead to confusion and must be excluded pursuant to Rule 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, *confusion of the issues, or misleading the jury*, … or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence" (emphasis added)).  Without taking into consideration shipping costs, logistical considerations and tax consequences the distance between the two locations is meaningless and irrelevant.

G.     **SPECIAL AGENT IN CHARGE JOHN J. McKENNA**

   ***Government's Proffer***

Special Agent John J. McKenna will explain that the term "transshipment" is used to describe an export that travels through a second, intermediary country before arriving at its intended, final destination. Mr. McKenna will describe the ways in which U.S. export controls on Hong Kong are allowing China far easier access to dual-use technologies having militarily-sensitive applications. Mr. McKenna will testify that Hong Kong is often used as a transshipment location and a means of illegally procuring Commerce controlled U.S. technology for end-users and customers in China. Mr. McKenna will further explain that Chinese companies located in Mainland China often set up small offices in Hong Kong simply to receive, and make arrangements to deliver, U.S. commodities (most often by simply driving the parts over the border between Hong

Kong and Shenzhen) to Chinese end-users thereby circumventing U.S. export laws. Mr. McKenna will opine that CHITRON'S Hong Kong office was a transshipment office.

Mr. McKenna will also testify that individuals and companies that transship goods through a second, intermediary country in violation of U.S. export laws often file false Shipper's Export Declarations identifying the ultimate consignee (final end-user) as being located in the transshipment location rather than the final location. The government anticipates that Mr. McKenna will opine that CHITRON-US and its agents caused the United Parcel Service to file Shipper's Export Declarations, which falsely identified Hong Kong freight forwarders (Hope Sea Electronics Company, Tung-D International Co. Ltd., and New Technology Company) and CHITRON'S Hong Kong office as the ultimate consignees rather than the end-users (CHITRON-SHENZHEN'S customers) located in Mainland China.

### *Defendants' Position*

If Agent McKenna's testimony regarding transshipments, and "the ways in which U.S. export controls on Hong Kong are allowing China far easier access to dual-use technologies having militarily-sensitive applications" are being offered as expert opinions then such testimony is inadmissible because of the government's failure to provide any discovery as to the bases for Agent McKenna's opinion in its Rule 16 Notice.  For the same reason, Mr. McKenna testimony about Hong Kong often being used as a transshipment location and a means of illegally procuring Commerce controlled U.S. technology for end-users and customers in China is also inadmissible.

It is impossible to determine the source of information from which Mr. McKenna will opine "that Chinese companies located in Mainland China often set up small offices

in Hong Kong simply to receive, and make arrangements to deliver, U.S. commodities (most often by simply driving the parts over the border between Hong Kong and Shenzhen) to Chinese end-users thereby circumventing U.S. export laws."  Moreover, it can hardly be said that Mr. McKenna's opinion that CHITRON'S Hong Kong office was a "transshipment office" can be considered proper expert opinion.  If relevant, it is a factual issue for the jury to determine, after being instructed by the Court.

He will further testify "that individuals and companies that transship goods through a second, intermediary country in violation of U.S. export laws often file false Shipper's Export Declarations identifying the ultimate consignee (final end-user) as being located in the transshipment location rather than the final location." The lack of Rule 16 discovery from the government impinges the defendants' ability to effectively cross-examine Mr. McKenna and vitiates the Defendant's <u>Crawford</u> confrontation rights with respect to the witnesses and documents employed by Mr. McKenna to arrive at his opinions.

If the testimony of Mr. McKenna is "overview" testimony as compared to expert opinions then it is inadmissible pursuant to the rationale set out in <u>Casas</u> and its progeny.

With respect to the only specifically denominated opinion the government expects Mr. McKenna to provide --that CHITRON-US and its agents caused the United Parcel Service to file Shipper's Export Declarations, which falsely identified Hong Kong freight forwarders (Hope Sea Electronics Company, Tung-D International Co. Ltd., and New Technology Company) and CHITRON'S Hong Kong office as the ultimate consignees rather than the end-users (CHITRON-SHENZHEN'S customers) located in Mainland

China – this opinion should be inadmissible as a result of the government's failure to provide adequate notice of the basis on which Mr. McKenna's opinion is rooted.

However, there is a more fundamental problem with Mr. McKenna's testimony. Whether items were shipped, what was written on the SEDs, whether and how long the goods stayed in Hong Kong, whether the goods then went to the PRC, who were the ultimate consignees and similar issues are all questions of fact. These facts can either be proven at trial or they cannot. But, the government should not be permitted to fill in the gaps through so-called expert opinion.

## H.    SPECIAL AGENT STEPHEN LaFOREST

### *Government's Proffer*

Special Agent LaForest has been employed by the Department of Commerce, Office of Export Enforcement for more than 5 1/2 years. Since 2006, Special Agent LaForest has been designated and trained as Seized Computer Evidence Recovery Specialist. Special Agent LaForest will testify about the preservation, forensic analysis and extraction of the digital media obtained in this case from the computer hard drives, copies of which were produced to the defendants. Special Agent LaForest will rely on his forensic software and tools to describe the accuracy of the process and authenticity of documents obtained from the digital and computer media seized in this investigation. Specifically, he will describe the processes and systems through which information was extracted for presentation at trial.

### *Defendants' Position*

Agent LaForest's testimony as to how the documents were recaptured from the various computers is admissible but Agent LaForest cannot testify as to the authenticity

of documents extracted.  He might be able to testify that the document, or a portion of the document, was on the computer hard drive, but cannot verify the *bona fides* of the information in the captured or recaptured documents.  To the extent Agent LaForest will attempt to authenticate the documents it would be inadmissible.

I.     **SENIOR IMMIGRATION SERVICES OFFICER BRIAN TURNER**

       ***Government's Proffer***

       The government anticipates that, if called as a witness, Mr. Turner will testify about how someone becomes a permanent legal permanent resident ("LPR") of the United States. The testimony will describe, among other things, (1) how an immigrant can adjust her status to become an LPR based on employment in the United States; (2) the documents (including Forms 1-485, 1-140, and G-325A) used and relied upon by CIS to determine whether to permit an immigrant to adjust her status to become an LPR; (3) the circumstances under which CIS will or will not waive the requirements of an interview or the presentation of evidence in processing a request for LPR status; (4) whether and why information provided on Forms 1-485 and G-325A is material to CIS'S decision whether to approve an application for adjustment to LPR status. Moreover, Mr. Turner will testify that if defendant YUFENG WEI a/k/a ANNIE WE1 ("WEI") had answered "yes" to any of the questions posed on Part 3 of the Form 1-485 she submitted in 2002 or had disclosed her prior employment at Perfect Science and Technology, such information would have caused CIS, at a minimum, to require WEI to submit to an interview and likely would have required her to present evidence in support of her application to adjust her status. CIS would have conducted a thorough inquiry into such information and would likely have denied Wei an adjustment to LPR status if she had

answered "yes" to any of the questions on Part 3 of Form 1-485 or had disclosed her prior

employment at Perfect Science and Technology. Mr. Turner's testimony will be based on

his academic and professional training, professional experience, and review of documents

pertaining to Wei's application for LPR status.

### *Defendants' Position*

The defendant Wei says that the government has not provided Mr.

Turner's qualifications as a potential expert witness, other than identifying him as a

Senior Immigration Services Officer, and therefore expects that he will be offered as an

overview witness.  As an overview witness, Mr. Turner would be qualified to testify as to

the methods that can be employed to alter an immigrant's status and what documents

might be required to be filed, but cannot opine about "the circumstances under which CIS

will or will not waive the requirements of an interview or the presentation of evidence in

processing a request for LPR status" or "whether and why information provided on

Forms 1-485 and G-325A is material to CIS'S decision whether to approve an application

for adjustment to LPR status."  Mr. Turner's testimony about what CIS might have done

if Wei had answered "yes" to certain questions is speculative and lacks any foundation

that should have been provided to the defendant under Rule 16.  These speculative, after

the fact, determinations, instead, must be made by the jury after being instructed on the

law by the Court, not by prosecutorial fiat through an un-denominated expert witness.

### J.   TERRY DAVIS

### *Government's Proffer*

The government has just recently further identified Terry Davis of the Directorate

of Defense Trade Controls as an expert witness although the government does not believe

this person will providing expert testimony but rather will be largely testifying as a keeper of records.  Mr. Davis will authenticate the trial certification of Secretary of State Hillary Clinton that the parts named in paragraph 19 of the introductory allegations of the Second Superseding Indictment were all designated on the United States Munitions List (each part with the exception of IRHSNA57064D was designated under Category XI of the USML while IRSHSNA5706D was designated under Category XV) on all dates relevant to the Second Superseding Indictment and that none of the defendants or any agent of CHITRON-US, CHITRON-SHENZHEN, or any other Chitron entity or any freight forwarder of Chitron ever applied for, or obtained, an export license to ship any defense article. Mr. Davis will also provide a brief overview of the Arms Export Control Act, USML, and the United States' Arms Embargo against the PRC consistent with paragraphs 13-15 and 20-21 of the introductory allegations of the Second Superseding Indictment.

### ***Defendants' Position***

The government proposes to offer through its "expert" witnesses documents that it refers to as "commodity classification determinations" and "commodity jurisdiction determinations."  At least so the defendants were initially informed.  It now appears that no "commodity jurisdiction determinations" will be offered, but rather that a keeper of the records witness from the Department of State will testify to the authenticity and, the defendants anticipate, the public record status of a document to which the government refers as a "trial certification."[7] The defendants have not received a copy of this "trial

---

[7] The defendants became aware of the government's intention in this regard just recently.  In its opposition to the defendants' motion to compel further discovery, the government states that, "At trial, the government will introduce a trial certification signed

certification."  Therefore, their objections to it are based upon the government's
description of it and perforce preliminary and incomplete.[8]

First, insofar as the document is offered for the truth of its assertion that none of
the defendants applied for an export license, it is straightforward hearsay.  Whether the
document would qualify for the exception that Rule 803(10) provides to the prohibition
of Rule 802 is a question that the defendants are unable to answer at this point.

Second, insofar as the document is offered to prove the occurrence of certain
agency action, i.e., the making of a "commodity jurisdiction determination," it is hearsay;
if offered to prove the contents of a record such as a "commodity jurisdiction
determination," it is barred by Rule 1002.

Third, insofar as the document is offered to establish as a matter of fact that the
semiconductor devices that the second superseding indictment alleges that the defendants
exported unlawfully are devices that are described by Categories XI and XV of the
United States Munitions List, it is hearsay.

Fourth and finally, insofar as the document is offered to convey a legal
conclusion, it is inadmissible under Rules 702 and 704.  See Nieves-Villanueva, v. Soto-
Rivera, 133 F.3d 92 (1st  Cir. 1997); United States v. Scop, 846 F.2d 135 (2d Cir. 1988).
The First Circuit's concern in Soto-Rivera, that in-court testimony of this sort not only

_____

by Secretary of State Hillary Clinton, the President's designee, using a keeper of records
from DDTC, that states that the parts charged in Counts 2 through 7 of the Indictment
and named in paragraph 19 of the Introductory Allegations of the Indictment were
designated as defense articles on the USML at the time they were exported by the
defendants and that no agent of Chitron-US or Chitron-Shenzhen (including the
defendants) applied for, or obtained an export license to ship these items."

[8]  The defendants have received copies of a number of "commodity classification
determinations," and much of what is objectionable about the "trial certification" is
objectionable about the "classification determinations."

usurps the role of the judge, but also can be misleading and incorrect while appearing to

be unduly authoritative, is not assuaged by the expediency of preparing a document to be

signed by a government official who does not appear to testify.  Again, although the

defendants have not seen the "trial certification," the government's preview of it

continues to conflate the <u>designation</u> of an item as a "defense article" by the President in

regulations with the <u>determination</u> of a State Department official in a specific case that an

item fits into one of the categories that the President has <u>designated</u> and thereby

constitutes a component of the United States Munitions List.[9]  The document should be

excluded.

Finally, Mr. Davis, identified as a keeper of the records, should not be permitted

to "provide a brief overview of the Arms Export Control Act, USML, and the United

States' Arms Embargo against the PRC," for all the same reasons why Mr. Baker, Mr.

Ports and Mr. Courduff's similar proposed testimony should be excluded.

---

[9]/  In 1976, Congress authorized the President to take actions the cumulative result of
which would be referred to thereafter as the "United States Munitions List."  The current
codified version of that grant of power is three sentences long:

> [T]he President is authorized to control the import and the export of
> defense articles and defense services and to provide foreign policy
> guidance to persons of the United States involved in the export and import
> of such articles and services. The President is authorized to <u>designate</u>
> those items which shall be considered as defense articles and defense
> services for the purposes of this section and <u>to promulgate regulations</u> for
> the import and export of such articles and services.  The items so
> designated shall constitute the United States Munitions List [emphasis
> supplied].

22 U.S.C. § 2778(a)(1).  Read carefully, this statutory provision does not create a "list"
or, as the government would have it, "a list of lists."  The USML is not a "catalogue," as the
second superseding indictment characterizes it, nor is it a compilation comparable to a
dictionary or a telephone directory.  Rather, the USML is the momentary product of a
continuing process of presidential actions, i.e., the designation in regulations of "items"
as "defense articles."

Respectfully submitted,

<u>Donald K. Stern</u>
BBO No. 479420
Cooley Goddard Kronish
500 Boylston Street
Boston, MA 02617
(617)937-2321
*Attorney for Zhen Zhou Wu*

<u>/s/ William J. Cintolo</u>
BBO No. 084120
Cosgrove, Eisenberg & Kiley
One International Place
Boston, MA 02617
(617)439-7775
*Attorney for Yufeng Wei*

<u>George C. McMahon</u>
BBO No. 338240
Marina Bay
308 Victory Road
Quincy MA 02171
(617) 770-0600
*Attorney for Bo Li*

<u>Paul W. Johnson</u>
BBO No. 252820
Two Center Plaza
Boston, MA 02108
(617)549-3665
*Attorney for*
*Chitron Electronics, Inc.*

Dated: November 12, 2009

## CERTIFICATE OF CONFERENCE

I hereby certify, pursuant to Local Rule 7.1(A)(2), that defense counsel and counsel for the government conferred by telephone on November 5, 2009 and agreed upon the matters raised by this motion.

<u>/s/  William J. Cintolo</u>

Dated:  November 12, 2009

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Joint Motion To Amend Second Pre-Trial Order is being filed electronically in compliance with this Court's ECF procedures and that copies accordingly will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on this day, November 12, 2009.

/s/  William J. Cintolo

Dated:  November 12, 2009