UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIMINAL NO. 08-10386-PBS |
| ZHEN ZHOU WU a/k/a ALEX WU, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM AND ORDER**

January 21, 2010

Saris, U.S.D.J.

Defendants Zhen Zhou Wu ("Wu"), Yufeng Wei ("Wei"), Bo Li ("Li"), Chitron Electronics, Inc. ("Chitron-US") and Chitron Electronics Company Limited ("Chitron-China") are charged with the illegal export of defense articles and technology controlled by the Department of Commerce from the United States to the People's Republic of China.[1] Defendant Wu filed a motion to suppress statements made to Customs and Border Protection ("CBP") agents at Chicago O'Hare International Airport on December 5, 2008 and the subsequent search of Wu's laptop computer. The

---

[1] Defendants are charged with the unlawful export of defense articles in violation of 22 U.S.C. §§ 2778(b)(2), 2778(c) (Counts 2-7), conspiracy in violation of 18 U.S.C. § 371 (Counts 1 and 32), unlawful export of commerce controlled goods in violation of 50 U.S.C. § 1705 and 18 U.S.C. § 2 (Counts 8-31), a scheme to falsify, conceal, and cover up material facts (aiding and abetting) in violation of 18 U.S.C. § 1001(a)(1) (Counts 33-34), money laundering in violation of 18 U.S.C. § 1956(a)(2)(A) (Counts 35-37), and use of a fraudulently obtained permanent resident card in violation of 18 U.S.C. § 1546(a) (Count 38).

Government has indicated that it does not plan to introduce Wu's border statements at trial. As to the subsequent search of Wu's laptop computer, the motion is **DENIED**.

## I. BACKGROUND FACTS

The facts underlying Defendant's Motion to Suppress are largely uncontroverted, and factual disputes are noted below. Neither party has requested an evidentiary hearing.[2]

### A. Statements Made to Customs and Border Protection Officials

On December 5, 2008, Defendant Wu sought admission to the United States at Chicago O'Hare International Airport after arriving in the United States on a flight originating in Hong Kong. Like all international passengers, Defendant was required to present himself and his travel documents (passport, visa, customs declaration form) to CBP officers at the border for a primary inspection. After passing through the primary inspection line, Wu proceeded to collect his baggage from a baggage carousel in the airport.

While Wu was in the area near the baggage carousels, he was approached by CBP Officers Arthur Beck and Ajaz Ahmed, who had

---

[2] Defendant requested an evidentiary hearing only in the event that this Court's opinion would turn on the factual dispute involving the location and duration of Defendant Wu's secondary inspection at Chicago O'Hare International Airport. (See Def.'s Reply to Gov't Opp'n at 2 n.1.) Because the factual dispute is irrelevant to the Court's analysis of this motion, no evidentiary hearing was conducted.

been alerted that Wu was the subject of an outstanding arrest warrant and would be seeking admission to the United States. The officers asked Wu to accompany them to a secondary inspection area, and Wu complied. The parties dispute the nature of this secondary inspection area. Wu describes it as a "small room separated from the other travelers and located somewhere off of the arrivals hall." (Wu Aff. ¶ 4.) The CBP officer who performed the secondary inspection stated that he escorted Wu to

> a large public area immediately behind, and visible from, the baggage carousel area. There is a rope that separates the two areas. Inside the secondary customs inspections area are four separate baggage conveyor belts used to perform baggage inspections. Directly behind, and adjacent to, the secondary inspection area is a private, enclosed search room that is used to give passengers privacy while conducting a search of their outer clothing.

(Beck Aff. ¶ 7.)

Once Defendant Wu entered the secondary inspection area with the CBP officers, Officer Beck conducted a secondary inspection of Wu that lasted approximately half an hour. (Wu Aff. ¶ 9; Beck Aff. ¶ 12.) This inspection consisted of questions verifying the information contained in Wu's Customs Declaration Form, questions about his identity and address, and questions about the purpose of his trip to the United States. (Beck Aff. ¶ 5.)

In response to Officer Beck's question about the purpose of his trip, Wu responded that his trip was for business. Officer Beck then asked Wu questions about his business activities, and Wu told Beck that he was 100% owner of Chitron, which he

3

described as a company that imports and exports electronics between China and the United States.  Wu went on to say that his U.S.-based company makes approximately $10 million annually while his company makes approximately $30 million per year in China.

After asking these admissibility questions, Officer Beck confirmed that the personal property in Wu's possession was in fact his property and that he had packed his bags himself. Officer Beck then personally searched Wu's bags and did not find any contraband.  Beck then specifically asked Wu about a laptop computer that was inside one of Wu's bags.  Wu confirmed that the laptop computer belonged to him and that he used it for business purposes.

Once the baggage search was completed, CBP Officers Beck and Ahmed escorted Wu to a search room to conduct a personal search of Wu's outer clothing.  Once completed, a Special Agent of the Department of Commerce entered the search room, placed Wu under arrest and advised him of his <u>Miranda</u> rights.

Wu claims that the CBP officers violated his Fifth Amendment rights by questioning him without giving the <u>Miranda</u> warnings. In support of this assertion, Wu offers a "script" titled "CBP Questions for Alex Wu" that was prepared prior to Wu's arrival at Chicago O'Hare International Airport.  The government has submitted an affidavit from CBP Officer Beck wherein he acknowledges having received a list of questions from an Immigration and Customs Enforcement ("ICE") agent regarding Wu,

but asserts that those questions did not affect which questions he chose to ask Wu on December 5, 2008. Officer Beck has submitted an affidavit stating that all questions asked of Wu were routine questions asked of all passengers undergoing secondary inspections, and that the questions were designed to elicit information about a person's right to enter the United States and bring their personal effects with them. (Beck Aff. ¶ 5.) Defendant denies that the questions were routine.

### B. Search of Wu's Laptop Computer

On December 17, 2008, after Wu's personal possessions (luggage, laptop computer, and mobile phone) had been transferred from Chicago ICE agents to Boston ICE agents through standard procedures, the Government sought a search warrant of Wu's laptop computer and mobile phone. Special Agent Edward Hayden of the Department of Commerce, who also arrested Wu, signed a 14-page affidavit in support of these warrants. Agent Hayden's affidavit incorporated a copy of a 52-page affidavit filed on December 4, 2008 in support of applications for search warrants for the Chitron-US office and Defendant Wei's residence.

Defendant points out that the Government chose not to apply for a search warrant for Wu's laptop computer on December 4, 2008, despite the fact that Wu's arrest was planned for the next day, when government officials knew he would be arriving in the United States based on his visa application. The Government

claims that it did not seek a search warrant for Wu's laptop computer in its December 4 application because the arrest was to take place in Chicago, which is outside the jurisdiction of the Magistrate Judge assigned to handle this case.

The December 4, 2008 affidavit filed by Special Agent Hayden included information regarding Wu's ownership and control of both Chitron-China and Chitron-US, in addition to details of alleged export violations committed by Wu and Chitron. In addition, Hayden explained why he believed that evidence of these export violations would be found on any "portable computer" brought by Wu into the United States. Hayden's belief was founded on his training and experience as a special agent for the Department of Commerce, in addition to specific information from Steve Gigliotti, a former employee of Chitron-US, that Wu typically visits the United States once a year to monitor business operations and usually brings a Chitron laptop computer with him when he travels to the United States.

The December 17, 2008 supplemental affidavit filed with the Magistrate Judge by Special Agent Hayden included the following paragraph to explain how Wu's laptop computer was obtained:

> 8. As described in paragraphs 102-103 of Attachment A, I have probable cause to believe that ALEX WU usually brings a CHITRON laptop computer with him when he travels to the United States. ALEX WU did in fact bring a portable computer to the United States when he traveled here on December 5, 2008. Prior to his arrest, during a routine secondary inspection conducted by Customs and Border Protection prior to being granted permission to enter the United States border, ALEX WU

>     made statements regarding this computer. He indicated
>     that the portable computer (IBM Thinkpad bearing serial
>     #LV-AD365) belonged to him and that he utilized it for
>     business purposes.

(See Hayden Aff. ¶ 8, Dec. 17, 2008.) Magistrate Judge Collings subsequently issued search warrants for both Wu's laptop computer and mobile phone.

## II. DISCUSSION

### A. <u>Admissibility of the Laptop Computer Search</u>

Defendant Wu argues that the search warrant for his laptop computer was issued in reliance on an affidavit that used his border statements as evidence of probable cause to search the computer. Wu contends that his border statements were taken in violation of <u>Miranda</u> and the Fifth Amendment, and therefore, that the exclusionary rule prohibits the admission of evidence obtained from the search of his laptop computer. See <u>United States v. Siciliano</u>, 578 F.3d 61, 68 (1st Cir. 2009) ("The exclusionary rule prohibits the introduction into evidence of tangible materials and knowledge acquired during an unlawful search.") (citing <u>Murray v. United States</u>, 487 U.S. 533, 536 (1988)).

Generally, "<u>Miranda</u> warnings need not be given to one detained at the border and subjected to a routine customs inquiry." <u>United States v. Silva</u>, 715 F.2d 43, 46-47 (2d Cir. 1983) (holding that a routine border inquiry includes identification of belongings); <u>see also</u> <u>United States v.</u>

Tajeddini, 996 F.2d 1278, 1288 (1st Cir. 1993) ("Routine customs questioning does not require Miranda warnings."). In fact, the Supreme Court has held that border searches are "not subject to any requirement of reasonable suspicion, probable cause, or warrant." United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985).

Although Wu argues that his secondary customs inspection was not routine and therefore required Miranda warnings, the First Circuit has held that questions regarding citizenship and purpose of an entrant's trip to the United States are routine, even when CBP officers are aware of likely criminal activity. See United States v. Fernandez-Ventura, 132 F.3d 844, 846-48 (1st Cir. 1998) (holding that a secondary customs inspection that lasted one hour and twenty minutes was routine and noncustodial, despite the fact that defendant was guarded by four armed officers). "Neither suspicion nor probable cause to arrest, without action to restrain the suspect, invoke the requirement for Miranda warnings." Tajeddini, 996 F.2d at 1287-88 (stating that defendant was not entitled to Miranda warnings by CBP officers prior to questioning about countries he had previously traveled to, despite the fact that CBP officers were aware of an outstanding warrant against his wife, with whom defendant was traveling). Even where probable cause exists to make an arrest, CBP officials are still "duty-bound" to determine the admissibility of an individual seeking to enter the United

States.  Silva, 715 F.2d at 47 (holding that questions about the defendant's "citizenship, the length and purpose of her trip to Canada, what items she had acquired or brought in Canada, and what items she had to declare upon entering the country" were routine questions asked by border officials that did not require Miranda warnings).  Despite the fact that CBP officers were aware of the outstanding warrant for Defendant Wu's arrest, they were still permitted to conduct an inspection of Wu and his belongings in the context of his application for admission to the United States.  The government contends that both statements relied on in the affidavit – that the laptop belonged to him and that he used it for business purposes – are responses to routine questions.  Under the case law, this argument is persuasive – particularly with respect to the inquiry as to whether the computer belonged to him; whether the computer was used for business purposes is a closer call, but a border official can lawfully ask about the purpose of an applicant's trip.

Even if a constitutional violation did, in fact, occur with respect to the purpose of the computer possessed by Wu, it does not change the Court's analysis here.  The First Circuit has stated that, "when faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause."  United States v. Dessesaure, 429 F.3d 359, 367 (1st Cir. 2005).  In this

case, if Wu's border statement that the computer was for business purposes is presumed to be inadmissible and is accordingly excised from Special Agent Hayden's application for a search warrant for the laptop computer, the Court need only find that probable cause existed in the absence of the border statement in order to admit the search of the laptop.

A warrant application "must demonstrate probable cause to believe that a particular person has committed a crime - 'the commission element' - <u>and</u> that enumerated evidence relevant to the probable criminality likely is located at the place to be searched - 'the nexus element.'" <u>United States v. Zayas-Diaz</u>, 95 F.3d 105, 110-11 (1st Cir. 1996). In examining an affidavit, a reviewing court should give "considerable deference" to the issuing magistrate's conclusion that probable cause has been established. <u>United States v. Woodbury</u>, 511 F.3d 93, 98 (1st Cir. 2007).

In determining whether or not probable cause exists, the First Circuit has held that a "nexus between the objects to be seized and the premises searched need not, and often will not, rest on direct observation, but rather 'can be inferred from the type of crime, the nature of the items sought . . . and normal inferences as to where a criminal would hide [evidence of a crime].'" <u>United States v. Feliz</u>, 182 F.3d 82, 88 (1st Cir. 1999) (quoting <u>United States v. Charest</u>, 602 F.2d 1015, 1017 (1st Cir. 1979)).

In this case, Special Agent Hayden's original affidavit, submitted to Magistrate Judge Collings on December 4, 2008 and incorporated in the application for a search warrant for Wu's laptop computer, offers the following evidence of a "nexus" between evidence of Wu's illegal exports and his computer. First, Hayden provides a detailed description of Wu's positions at Chitron-China and Chitron-US, and his involvement in the allegedly illegal exports. (Hayden Aff. ¶¶ 23-24, 47-52, 55-68, 70-79, 82, 86-93, Dec. 4, 2008.) The affidavit described Wu as the President of both Chitron-US and Chitron-China (id. ¶ 28) who told a U.S. employee during a discussion about export violations that he "was not afraid to go to jail and wanted to see the PRC advance in a similar way to the United States." (Id. ¶ 82.)

The December 4, 2008 affidavit also clearly explained why Special Agent Hayden believed that evidence of Wu's export violations would be found on Wu's laptop computer. As examples, the Court notes the following paragraphs included in the affidavit.

> 95. All companies that export U.S. origin goods or technology outside the United States are required to maintain records of those exports for a period of five years (from the date of export or any known re-export, transshipment, or diversion of such items) under the Export Administration Regulations, 15 C.F.R. Part 762. As a result, exporters are required to maintain export control documents, including SEDs, correspondence, contracts, and financial records relating to all "exports of commodities, software, or technology from the United States and any known reexports, transshipment, or diversions of items exported from the United States." 15 C.F.R. § 762.1.

11

96. In addition to this requirement, based upon my training and experience, and on information provided to me by other law enforcement agents, individuals involved in the illegal export or procurement of defense articles or controlled commodities or the violation of U.S. embargoes often maintain records and documents related to their unlawful activities. For instance, persons or companies involved in the illegal exportation or procurement of U.S. defense articles, controlled commodities, or other goods, keep records of their orders received or placed, purchases or sales, storage, manufacture, distribution, and shipments. Such records and documents most often include requests for quotes, quotes, correspondence (including e-mail), memoranda, notes, invoices, purchase orders, shipping labels and documents, shipper's letters of instruction, packing clips or other delivery records, airway bills, inventory documents, sales records, payment records, export licenses, and contracts.

**XII. PROBABLE CAUSE TO BELIEVE EVIDENCE WILL BE FOUND ON ALEX WU'S PORTABLE COMPUTER**

102. In November 2008, ALEX WU applied for a visa to enter the United States to attend a business conference in New York, which begins on December 11, 2008. In his application, ALEX WU indicated that he would also be visiting CHITRON-US to oversee its operations as its president.

103. [Steve Gigliotti, Wu's employee for five years at Chitron-US] indicated that ALEX WU typically visits the United States at least once a year to monitor CHITRON-US' operations. According to Gigliotti, during these visits ALEX WU stays in ANNIE WEI's residence. Gigliotti further advised me that ALEX WU usually brings a CHITRON laptop computer with him when he travels to the United States. In my experience, business officers often travel with their company laptops to ensure no disruption in business operations.

(Hayden Aff. ¶¶ 95-96, 102-03, Dec. 4, 2008.)

Each of the above paragraphs was written, and submitted to the Magistrate Judge, prior to Wu's secondary customs inspection on December 5, 2008. These pieces of evidence were supplemented

12

with Wu's statements made at the border on December 5. (See Hayden Aff. ¶¶ 8-9, Dec. 17, 2008.) For the purposes of this analysis, Wu's statements made at the border, with the exception of the undisputed admission that the laptop computer belonged to Wu, will be excised from Special Agent Hayden's affidavit.

Nonetheless, based upon the above-described evidence from Special Agent Hayden, the Court concludes that, even without the excised statements, there was probable cause to believe that a crime had been committed, namely numerous export violations of electronic components on the United State Munitions List and the Commerce Control List, and that there was a nexus between those crimes and Alex Wu's computer, which a former employee stated was used for business and brought into the country with Wu when he visited Chitron-US. Moreover, the affidavit states that many communications between Chitron-US and Chitron-China took place through computer-to-computer communication, leading to a reasonable inference that evidence of export violations would be found on Wu's computer. The fact that the laptop computer was indeed brought into the country by Wu on December 5, 2008 supports the other evidence in Agent Hayden's affidavits. Accordingly, Agent Hayden's December 4, 2008 affidavit, submitted to the Magistrate Judge in support of the application for a search warrant for Defendant Wu's laptop computer, establishes probable cause for a search of the computer. Therefore, the exclusionary rule does not apply, and any evidence found during a

search of the computer will not be suppressed.

**B.    Fifth Amendment Self-Incrimination Clause**

The Defendant argues, alternatively, that the evidence seized during the search of Wu's laptop computer must be suppressed because it is testimonial in nature and therefore its admission at trial would violate the Self-Incrimination Clause of the Fifth Amendment.  This argument has no merit.

The Supreme Court has held that an individual cannot suppress, on Fifth Amendment grounds, private papers seized by the government under a validly issued search warrant.  Andresen v. Maryland, 427 U.S. 463, 472-73 (1976); see also Johnson v. United States, 228 U.S. 457, 458 (1913) ("A party is privileged from producing the evidence, but not from its production.").

In addition, this Court recently held that the "'ingredient of personal compulsion'" was necessary for the invocation of the Fifth Amendment.  In re Grand Jury Subpoena, __ F. Supp. 2d __, 2009 WL 3790287 (D. Mass. Nov. 12, 2009) (quoting Couch v. United States, 409 U.S. 322, 335-36 (1973)).  The evidence from Wu's computer was seized by law enforcement officers acting pursuant to a warrant.  Wu was not in any way involved in the production. The "ingredient of personal compulsion" is lacking, and Wu may not invoke the Fifth Amendment to prevent the admission of the evidence found on his laptop computer at trial.

### III.    CONCLUSION

With respect to Wu's statements made at the border on December 5, 2008, the motion to suppress (Docket No. 104) is **MOOT** because the government does not seek to introduce them as evidence. The motion to suppress with respect to the search of Defendant Wu's laptop computer is **DENIED**.

                                            /s/ Patti B. Saris
                                     _____
                                     PATTI B. SARIS
                                     United States District Judge