UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                  )
UNITED STATES OF AMERICA          )
                                  )
            v.                    )   CRIMINAL NO. 08-10386-PBS
                                  )
ZHEN ZHOU WU a/k/a ALEX WU;       )
YUFENG WEI a/k/a ANNIE WEI;       )
CHITRON ELECTRONICS, INC.,        )
                                  )
            Defendants.           )
                                  )
```

**MEMORANDUM AND ORDER**

January 4, 2011

Saris, U.S.D.J.

Defendants Zhen Zhou Wu ("Wu"), Yufeng Wei ("Wei"), and Chitron Electronics, Inc. ("Chitron-US") were indicted for illegal export of defense articles, and of technology controlled by the Department of Commerce from the United States to the People's Republic of China.[1] After a lengthy jury trial with close to 1,000 exhibits, the jury convicted defendants Wu and Wei of four counts of unlawfully exporting defense articles in violation of the Arms Export Control Act (AECA) between 2004 and 2006, but found defendant Wu not guilty of a fifth count. It

---

[1] This memorandum and order does not pertain to defendant Chitron-US, as the corporation has not filed any motions for post-conviction relief.

convicted defendant Chitron-US of all five counts.[2] (<u>See</u> Jury Verdict, Docket No. 203.) Defendants were also convicted of various other charges. Both Wu and Wei were convicted of two counts of conspiracy and of a scheme to falsify, conceal, and cover up material facts in violation of 18 U.S.C. § 1001(a)(1). Wu was convicted of twelve counts of unlawful export of commerce controlled goods in violation of 50 U.S.C. § 1705 and 18 U.S.C. § 2, and Wei was convicted of seven counts of the same charge. Finally, Wei was convicted of using a fraudulently obtained permanent resident card in violation of 18 U.S.C. § 1546(a). (<u>See</u> Jury Verdict, Docket No. 203.)

Four days prior to trial, defendants moved to dismiss the AECA Counts on the grounds that the AECA does not provide sufficient notice of the conduct it prohibits, and that the government's determination that the charged parts were on the USML violates the Ex Post Facto clause of the Constitution as applied to the defendants. (Docket No. 161.) In order to give the government time to respond to the motion to dismiss, and so that the Court could properly consider the important, difficult and complex underlying legal and factual issues, the Court delayed ruling on the motion until after the completion of the

---

[2] For ease of discussion, I refer to the five counts of Arms Export Control Act violations in the Third Superseding Indictment as the "AECA Counts."

trial.[3]  After trial, defendants Wu and Wei filed motions to set

aside the verdict and for a new trial.  (Docket Nos. 208, 210.)

Although the post-trial motions are far-reaching and seek to set

aside each of defendants' convictions, the Court writes now only

to address the constitutional concerns related to the AECA

counts.

After a review of the evidence admitted at trial and the

applicable law, the Court **ALLOWS** defendants' post-trial motions

(Docket Nos. 208, 210) as to Counts 2 and 3 and **DENIES** those

motions as to all other counts of which defendants were

convicted.  The Court also **DENIES** defendant Wei's Motion for

Acquittal on Count 34 of the Indictment (Docket No. 190; <u>see also</u>

Docket No. 210).

---

[3] It is a common practice for district courts to defer
ruling on motions to dismiss until after trial, where factual
development at trial will assist the court in analyzing
constitutional claims.  <u>See</u> Fed. R. Crim. P. 12(e) (stating that
a court may defer ruling on a pretrial motion if "it finds good
cause"); <u>see also</u> <u>United States v. Carter</u>, 465 F.3d 658, 660 (6th
Cir. 2006); <u>United States v. Wilson</u>, 26 F.3d 142, 160 (D.C. Cir.
1994).  Because the Court addressed the due process as-applied
challenge after a review of the evidence, the Court **DENIES** the
motion to dismiss (Docket No. 161).

## I.  DISCUSSION[4]

The defendants seek to vacate convictions of the AECA Counts on two grounds: (1) that the AECA and related regulations did not provide sufficient notice to defendants of the prohibited conduct; and (2) that the charges violate the Ex Post Facto clause of the Constitution.

## A.  Void-For-Vagueness Doctrine

### 1.  Statutory and Regulatory Framework

Defendants are charged with violating the Arms Export Control Act, 22 U.S.C. § 2778, which states that

> In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

Id. § 2778(a)(1).  The Act goes on to state that "no defense articles or defense services designated by the President . . . may be exported or imported without a license." Id. § 2778(b)(1)(B).  Section 2778(c) creates criminal liability for

---

[4] The Court has previously written on the background facts of this case and assumes the parties' familiarity with them.  See United States v. Chitron Elec. Co., 668 F. Supp. 2d 298 (D. Mass. 2009); United States v. Wu, 680 F. Supp. 2d 287 (D. Mass. 2010).

willful violation of the Act, and defendants were prosecuted under this section.

The President has delegated his authority to designate defense articles and services to the Secretary of State. 22 C.F.R. § 120.1(a). The Department of State has promulgated the International Traffic in Arms Regulations (ITAR), which include the United States Munitions List (USML), a list of defense articles and services that require a license for export, subject to certain exceptions, under the AECA. However, the USML is not a list of specific parts or part numbers that require licenses. It is rather a grouping of twenty-one categories that list the types of parts that are defense articles. See 22 C.F.R. § 121.1 (USML).

The charged parts in the AECA counts for which defendants were found guilty fall within USML Category XI - Military Electronics.[5] Id. This category lists many types of electronics, such as radar equipment, that are "specifically designed or modified for military application." It also includes "[c]omponents, parts, accessories, attachments, and associated equipment specifically designed or modified for use with the equipment in paragraphs (a) and (b) of this category, except for such items as are in normal commercial use." The government

---

[5] Defendant Chitron-US was also found guilty of Count 6, which fell within USML Category XV - Spacecraft Systems and Associated Equipment.

indicted defendants for exporting electronics components specially designed or modified for use with military electronics.

The Department of State does not generally make USML determinations about specific products as soon as they reach the market. Most often, the manufacturer or license applicant self-designates an item as controlled under the USML. (Davis Tr. 10-11, May 5, 2010.) In fact, in order to apply for USML licenses from the Department of State, a manufacturer must register with the Department of State. Registration requirements include the obligation to self-designate defense article at the time of manufacture. (Id. at 19.) However, this manufacturer determination is not made public in the regulations or any other pronouncement.

If a party is unsure about the status of a particular part, a Commodity Jurisdiction determination can be used "to clarify or readdress whether something is on the U.S. Munitions List." (Id.) A Commodity Jurisdiction request can be submitted to the Department of State by a private party, such as a manufacturer or exporter, or by another government agency. Thus, if a manufacturer or exporter is unsure whether or not a particular product falls within a category of the USML, the Directorate of Defense Trade Controls ("DDTC"), an office of the Department of State, will examine technical specifications of a product, along with other information, and determine whether or not it is on the Munitions List. 22 C.F.R. § 120.4. Terry Davis, the Deputy

-6-

Director of the Office of Licensing within the DDTC, testified
that under this regulatory framework, specific parts are
considered to be on the USML "at the time of manufacture." (<u>Id.</u>
at 21.) The Commodity Jurisdiction process can take up to six
months where there is a dispute about jurisdiction.  (<u>See</u> Def.'s
TXs 30, 44.)

If a product is on the USML, then an exporter must obtain a
license from the Department of State prior to exporting the
defense article out of the United States.

    2.    **Vagueness Challenges: The Legal Standard**

The Due Process Clause of the Constitution "mandates that,
before any person is held responsible for violation of the
criminal laws of this country, the conduct for which he is held
accountable be prohibited with sufficient specificity to forewarn
of the proscription of said conduct."  <u>United States v. Anzalone</u>,
766 F.2d 676, 678 (1st Cir. 1985).  "As generally stated, the
void-for-vagueness doctrine requires that a penal statute define
the criminal offense with sufficient definiteness that ordinary
people can understand what conduct is prohibited and in a manner
that does not encourage arbitrary and discriminatory
enforcement."  <u>Kolender v. Lawson</u>, 461 U.S. 352, 357 (1983); <u>see</u>
<u>also</u> <u>Skilling v. United States</u>, 130 S. Ct. 2896, 2933 (2010);
<u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972); <u>Bouie v.</u>
<u>City of Columbia</u>, 378 U.S. 347, 350-51 (1964).  The fact that the

government "might, without difficulty, have chosen '[c]learer and more precise language' equally capable of achieving the end which it sought does not mean that the [regulations] which it drafted [are] unconstitutionally vague." United States v. Powell, 423 U.S. 87, 94 (1975) (quoting United States v. Petrillo, 332 U.S. 1, 7 (1947)). "Rather, regulations are unconstitutionally vague 'only when they expose a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct.'" United States v. Hescorp, Heavy Equip. Sales Corp., 801 F.2d 70, 77 (2d Cir. 1986) (quoting Rowan v. U.S. Post Office Dep't, 397 U.S. 728, 740 (1970)).

The Supreme Court has stated that "[i]n the field of regulatory statutes governing business activities, where the acts limited are in a narrow category, greater leeway is allowed" in terms of what level of notice can be deemed "fair." Papachristou v. City of Jacksonville, 405 U.S. 156, 162 (1972). "[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982) (involving a pre-enforcement facial challenge to village ordinance regulating drug paraphernalia); see also United States v. Hsu, 364 F.3d 192, 196 (4th Cir. 2004) ("But 'where, as here, a criminal statute regulates economic

-8-

activity, it generally is subject to a less strict vagueness test.'" (quoting <u>United States v. Sun</u>, 278 F.3d 302, 309 (4th Cir. 2002))); <u>United States v. Lee</u>, 183 F.3d 1029, 1032 (9th Cir. 1999).

Because defendants do not contend that the AECA or its implementing regulations implicate First Amendment freedoms, the Court must examine their vagueness challenge as applied to the facts of the case at hand. As the <u>Hsu</u> court explained,

> Thus, the question of whether the AECA or its regulations suffice to provide a hypothetical defendant fair notice as to what [items] qualify as "military," and so require an export license, is not before us. Rather, we need only determine whether the statute and regulations were vague as applied to these particular defendants-i.e., whether [defendants] in fact had fair notice that the statute and regulations proscribed their conduct.

<u>Hsu</u>, 364 F.3d at 196 (quoting <u>Vill. of Hoffman Estates</u>, 455 U.S. at 495 n.7).

### 3. Vagueness Challenge to the AECA and the USML

Defendants claim that because the military electronics at issue in this case were not easily identifiable as "defense articles," they did not have fair notice that exporting the M/A Com products without a license violated the AECA. The electronic components at issue in this case are computer chips the size of a cockroach. Eyeballing the electronic component does not reveal that it has a military application. The government itself has stated that it does not

allege that any reasonable person would have known by
merely looking at the charged parts that they fell into
a USML category or that the USML, by itself, put the
defendants on notice that the charged parts constituted
defense article.  To the contrary, the government
alleges that the defendants were put on both actual and
constructive notice that the parts in question were
controlled for export and that it was illegal to export
them to China without first obtaining an export
license.

(Docket No. 153 at 2.)  The purpose of the components is not
readily apparent, unlike other types of items on the USML, such
as firearms.  (See, e.g., Gov't Trial Exhibit ("TX") 612 (M/A Com
parts).)

Four courts of appeal have ruled against defendants raising
vagueness challenges to the AECA and the USML.  See Hsu, 364 F.3d
at 197-98; Lee, 183 F.3d at 1032-33; United States v. Gregg, 829
F.2d 1430, 1437-38 (8th Cir. 1987); United States v. Swarovski,
592 F.2d 131, 133 (2d Cir. 1979).  Those courts have relied
heavily on the holding in Hoffman Estates that "a scienter
requirement may mitigate a law's vagueness, especially with
respect to the adequacy of notice to the complainant that his
conduct is proscribed."  455 U.S. at 499; see also Screws v.
United States, 325 U.S. 91, 103-04 (1945).  Section 2778(c) of
the AECA creates a willfulness scienter requirement as an element
of the criminal offense.  As the Ninth Circuit has explained,
"[t]his protects the innocent exporter who might accidentally and
unknowingly export a proscribed component or part whose military
use might not be apparent through physical appearance."  Lee, 183

F.3d at 1032-33.

The Fourth Circuit's opinion in <u>Hsu</u> is instructive because the articles at issue are analogous to the components in the instant case. There, the defendants exported to China encryption devices that the government claimed fell within Category XIII(b) of the Munitions List. Category XIII(b) includes "cryptographic devices . . . specifically designed or modified for military purposes." 22 C.F.R. § 121.1. To qualify as a "military" encryption device, a product must be "specifically designed, developed, configured, adapted, or modified for a military application," and (1) have no "predominant civil applications" and (2) have "significant military or intelligence applicability such that control under this subchapter is necessary." <u>Id.</u> § 120.3. The defendants in <u>Hsu</u> claimed that the regulations "do not make clear what encryption products are covered by the Munitions List." 364 F.3d at 197.

Significantly, though, the defendants, who purchased the exported item from an undercover officer, were told repeatedly and specifically "that the device was on the Munitions List; that it required a license for export; that no license would be approved if the end-user was in China; and that export of the device without the required license violated the law." <u>Id.</u> at 195. The requirement that the government prove that defendants "knowingly and willfully" violated the AECA when they acted to export the encryption devices eliminated "any genuine risk of

holding a person 'criminally responsible for conduct which he could not reasonably understand to be proscribed.'" Id. (quoting Sun, 278 F.3d at 309); see also Hoffman Estates, 455 U.S. at 499. "[B]ecause the AECA permits an arrest only if an individual acts 'with the requisite criminal intent,' it cannot be deemed constitutionally vague as-applied." Id. (quoting Sun, 278 F.3d at 309).

The defendants in Hsu argued that "they were not experienced 'munitions exporters' and the encryption devices here, unlike the missile and bomb parts at issue in [Sun, 278 F.3d at 309], are not exclusively designed for military use." Id. at 197 n.1. Concluding that these factual differences did not change did not change the legal analysis, the court held, "The reasoning in Sun - that requiring the jury to find a defendant acted 'willfully' necessarily leaves 'innocent' exporters outside the statute's scope and so vitiates any vagueness concerns - applies equally here." Id.

Apart from Hsu, all the other cases that rejected vagueness challenges involved exports of items that were clearly military in nature. In Lee, for example, the defendants were convicted of exporting die mold and cutter blades to China without obtaining an export license. These items fall within Category III of the Munitions List, which includes "fuzes and components therefor" for ammunition falling within the category. Unlike the instant case, the Lee court stated that "there is no dispute that cutter

-12-

blades have only one use and that is military." 183 F.3d at
1032. The court's analysis focused on that fact that the
"regulation is directed to a relatively small group of
sophisticated international businessmen. Given that context, it
is clear that the regulation sufficiently communicates its
meaning." Id. The court went on to say that "[i]n the sensitive
business of exporting military items, the statute and its
implementing regulation more than suffice to put exporters on
notice to consult the applicable regulations and, if necessary,
contact the appropriate government agency to resolve any
perceived ambiguity." Id. (citing Hoffman Estates, 455 U.S. at
498 ("Indeed, the regulated enterprise may have the ability to
clarify the meaning of the regulation by its own inquiry, or by
resort to an administrative process.")). Because the field of
exporting military items is so narrow and specialized, "an
exporter of ordinary intelligence should be on notice that
inquiry is required before shipping an item that might be subject
to the regulation." Id. at 1033.

The defendants in Lee made a similar argument to the one
emphasized by defendants in this case, namely, that the exported
item's physical appearance did not reveal its military
applications. However, the case is distinguishable because a
witness at trial testified that "he overheard [the defendant]
saying that the cutter blades were going to a military parts
factory for inclusion in a metal weapon; that an export license

-13-

was required; and that the license could not be obtained because of the restriction on exportation of military parts." Id. at 1031. The court stated that the AECA's scienter requirement "protects the innocent exporter who might accidently [sic] and unknowingly export a proscribed component or part whose military use might not be apparent through physical appearance, such as the cutter blade at issue in this case." Id. at 1032-33.

While due process challenges to the AECA are difficult to mount, the Seventh Circuit recently assailed the use of "secret" USML determinations to establish criminal liability:

> A regulation is published for all to see. People can adjust their conduct to avoid liability. [To the contrary, a] designation by an unnamed official, using unspecified criteria, that is put in a desk drawer, taken out only for use at a criminal trial, and immune from any evaluation by the judiciary, is the sort of tactic usually associated with totalitarian régimes. Government must operate through public laws and regulations.

United States v. Pulungan, 569 F.3d 326, 328 (7th Cir. 2009) (citing United States v. Farinella, 558 F.3d 695 (7th Cir. 2009)).

In analyzing an as-applied challenge to the AECA, the Court must determine whether the statute and regulations were vague as applied to these particular defendants - that is, whether they in fact had fair notice that the statute and regulations proscribed their conduct. The case law provides two guiding principles. First, if it is self-evident that the parts have a military application, there is no due process violation. See, e.g., Sun,

-14-

278 F.3d at 308 (denying a vagueness challenge in a case where defendants exported "wing assemblies for guided bombs, fin assemblies for air launched missiles, wing assemblies for air launched missiles, duct assemblies for the B-1 bomber, and missile fins for air launched guided missiles"); Lee, 183 F.3d 1029 (see supra); Swarovski, 592 F.2d at 132 (denying vagueness challenge to the AECA predecessor statute in the case of a defendant who exported a military aircraft gunsight camera). Second, even when it is not self-evident that the parts have a military application, where a defendant is told or has independent knowledge that an item is on the Munitions List or is a defense article that requires an export license, the AECA and ITAR are not vague as-applied. Hsu, 364 F.3d at 196 (see supra); Gregg, 829 F.2d at 1437 (denying vagueness challenge based on the fact that the government is required to prove "that the defendant knowingly and willfully exported [a Munitions List item], with the necessary intent and knowledge, and without an appropriate license"); Swarovski, 592 F.2d at 132 (denying vagueness challenge where defendant received notice that "[a]bove photographic equipment is under United States Department of State Munitions List Category number XIII(a), and as such must be export licensed by the U.S. Department of State prior to export from the United States").

     With this case law in mind, I will now review the available

evidence for each of the AECA counts.

**4.    The Evidence**

(i) <u>Counts 4 and 5: Phase Shifters</u>

With respect to Counts 4 and 5, the Court rejects a vagueness challenge because defendants had actual notice of the charged parts' status on the USML.

Count 4 charges the defendants with exporting ten M/A Com Phase Shifters, part number MAPCGM0003, on June 16, 2006.[6]  The evidence shows that defendants purchased the products from Richardson Electronics, a distributor.  On June 12, 2006, Richardson sent Chitron-US a purchase order, listing the MAPCGM0003 parts, and including the following information in capital letters: "EXPORT OR RE-EXPORT OF THIS COMMODITY MAY REQUIRE PRIOR GOVERNMENT APPROVAL.  THIS PRODUCT IS SUBJECT TO EXPORT CONTROLS AS FOLLOWS:  AGENCY: DEPARTMENT OF STATE. CATEGORY NO: XI."  (Gov't TX 41.)  The purchase order also included the language: "EXPORT DOC, CHECK FOR EXPORT LICENSE." (<u>Id.</u>)  The invoice for this purchase included the same information, naming the Department of State as the agency controlling this product for export under Category XI.  (<u>Id.</u>)

_____

[6] A phase shifter is "used primarily for military phased array radar applications, and could be used for military satellite communications and [Electronic Warfare]."  (Gov't TX 607.)  "Phased arrays allow one to directionally orient the antenna without any moving parts."  (<u>Id.</u>)  "The operating band of this digital phase shifter device (S-Band) is a preferred band of military surveillance radar applications."  (Gov't TX 613.)

Moreover, in March 2006, Richardson sent Chitron a Price Quotation that listed the M/A Com MAPCGM0003 Phase Shifter with the same language specifying that the product was under the jurisdiction of the Department of State and was in Category XI. (Gov't TX 39.)

Even though these documents were sent to Chitron-US, there is no evidence that Wei or Wu actually read these notifications in the purchase order, price quotation or invoices. However, both defendants, who were previously married, were hands-on micro-managers. Annie Wei was the supervisor of the Chitron-US office and was involved in the day-to-day purchasing. She communicated daily with Wu through tasking lists. The jury had sufficient evidence to attribute the knowledge of Chitron-US's employees to Wei and Wu. They were courting military customers. Defendant Wu in particular held himself out to the public as an exporter of military items, and in fact publicized the fact that institutions connected to the Chinese military were among his clientele. Phase shifters are used primarily for military radar applications. A jury could reasonably infer that the defendants knew or were willfully blind to the notice from the distributor to the corporation that these parts were on the USML.

It is irrelevant that notice came from the distributor, because actual notice from any source that conduct is illegal can support a finding of scienter. See Hsu, 364 F.3d at 197-98 ("Nor do we find persuasive Defendants' argument that vagueness

problems persist here because an undercover agent posing as a sales representative, rather than the government qua government, informed them of the illegality of the proposed exportation. Fair notice requirements are simply not implicated when a defendant engages in conduct knowing it is illegal, regardless of how he procured this information."); <u>United States v. Malsom</u>, 779 F.2d 1228, 1234-35 (7th Cir. 1985) (finding specific intent when an export shipper and a friend warned defendant that an export license was required); <u>Swarovski</u>, 592 F.2d at 132-33 (finding no constitutional vagueness when manufacturer provided notice).

The evidence also shows that M/A Com, the manufacturer, <u>always</u> considered these phase shifters to be Munitions List items.  In August 2003, the Tri-Services Committee of the Department of Defense "verbally informed M/A Com that [the phase shifter] should be ITAR controlled."  (Gov't TX 607.)  After that date, M/A Com treated these parts as being on the USML and "[a]ll quotes, orders and delivery notes/packing slips" stated that the product was under State Department jurisdiction.  (<u>Id.</u>)  In December 2007, M/A Com wrote to the Office of Defense Trade Controls Policy that "[t]he subject 6-bit Phase Shifter was designed as a standard catalog part directed for Aerospace and Defense markets. . . . At this time we are not aware of this part being used in a commercial application, air traffic control or weather radar."  (Gov't TX 607.)

Count 5 charges the defendants with exporting 10 M/A Com

Phase Shifters, part number MAPCGM0002, on June 23, 2006. The evidence shows that defendants purchased the products from Microwave Components, Inc. On June 6, 2006, Microwave sent a price quotation to Chitron-US for the MAPCGM0002 part that included a boilerplate, small print sentence at the bottom of the page that stated "Any export may require prior authorization by the U.S. Government." (Gov't TX 150.) On June 15, 2006, Microwave sent an invoice to Chitron-US for the part that also included boilerplate, small-print language: "Any export may require prior authorization by the U.S. Government. The purchaser solely is responsible for complying with all U.S. export licensing requirements.[7] (Gov't TX 152.)

Prior to purchasing the items from Microwave, Chitron-US sought a price quotation on the same part from Richardson Electronics. The price quotation sent to Chitron-US on May 10, 2006 stated that the MAPCGM0002 phase shifter "requires export license . . . . THIS PRODUCT IS SUBJECT TO EXPORT CONTROLS AS FOLLOWS: AGENCY: DEPARTMENT OF STATE, CATEGORY NO: XI." (Gov't TX 39.) In addition, an email sent to Michael Qin, a buyer for

---

[7] Interestingly, on August 30, 2006, after the defendants exported the part, they received another price quotation from Microwave for a M/A Com MAPCGM0002 Phase Shifter that stated in all-caps, bold print: "[MAPCGM0002 is] under the jurisdiction of the US Dept of State and required prior authorization from the US Dept of State to export. MCI and M/A-Com advises that any export of these devices, or any product containing these devices, must be approved by the US Dept of State prior to the transaction taking place." (Gov't TX 150.)

Chitron-US, from Colin Bannister of Richardson Electronics on May 10, 2006 included the same information about the Department of State's jurisdiction and the phase shifter's inclusion in Category XI. (Gov't TX 587.) The same email stated "This part requires export license so [end-user statement] will be required." (Id.)

The evidence shows that, prior to the export by defendants, the State Department had received three applications (from Richardson Electronics and M/A Com) for USML export licenses for M/A Com part MAPCGM0002. (Gov't TX 616.)

Defendants did have specific and clear notice that the charged parts in Counts 4 and 5 fell within Category XI of the United States Munitions List. In addition, at all relevant times, the manufacturer self-designated these charged parts as regulated by the United States Munitions List. Accordingly, the defendants had actual notice that export of MAPCGM0003 and MAPCGM0002 to China without a license violated the Arms Export Control Act. As applied to these defendants in the context of Counts 4 and 5, the AECA is not unconstitutionally vague.

(ii) Counts 2 and 3: Power Amplifiers

Counts 2 and 3 are much more difficult because the notice to defendants did not clearly inform them that the items were defense articles, and the manufacturer itself had not self-designated the items as being on the USML at the time of the export.

Count 2 charges the defendants with exporting three M/A Com
Power Amplifiers, part number MAAPGM0038, on April 24, 2004.[8]  The
evidence shows that the defendants purchased these amplifiers
from Future Electronics, a distributor or wholesaler, on April
20, 2004.  (Gov't TX 112.)  The invoice for this purchase
notified the defendants that "[t]he goods in this transaction are
subject to U.S. export laws.  Subsequent export/re-export of
these commodities is subject to the authority of the U.S.
Department of Commerce - Bureau of Industry and Security."  (Id.)
Company tasking lists from 2003, found on Mr. Wu's computer,
contain statements showing that the parties were aware that part
MAAPGM0038 required an export license.  (See Gov't TX 254
(tasking list from Mar. 18, 2003, requests that buyer "try
Microwave first, Richardson in China quoted [a price], but they
asked for export license"; Maylyn Murphy replied that the part
"does need export license, cannot buy this part"); Gov't TX 270
(noting that part is "export restricted"); Gov't TX 282 (tasking
list from Nov. 20, 2003, stating that "[n]ow it seems that most
M/A com parts need license now" and "[t]he only way we can save
these orders is if we apply for License from the US.
Government"); see also Trial Tr. vol. 4 at 76 (testimony of
Maylyn Murphy) (stating that, with respect to an order for

_____

[8] A power amplifier is "something that makes a signal
stronger," and in this case, something that amplifies radio
frequencies to a "very high frequency that's useful for
communications [and] networks."  (Horowitz Tr. 60-61.)

MAAPGM0038, she was asked "to contact Microwave to find out if they have the same rule [about export licenses], and I actually contacted Microwave, and they mentioned that it doesn't matter what distributor you contact; it's going to be the same policy").)  Thus, the defendants had actual, specific notice that the parts in Count 2 were export-restricted, and may have needed a license of some sort.  However, the invoice from Future Electronics (wrongly) stated that the parts were under the jurisdiction of the Department of Commerce, as opposed to the Department of State.

Count 3 charges the defendants with exporting five M/A Com Power Amplifiers, part number MAAPGM0034, on April 24, 2004.  The evidence shows that the defendants purchased the products from Future Electronics on April 20, 2004.  (Gov't TX 111.)  The invoice sent to Chitron-US by Future stated that "[t]he goods in this transaction are subject to U.S. export laws."  (Id.)  In addition, prior to purchasing the parts from Future Electronics, Chitron-US sought a price quotation for the MAAPGM0034 from Richardson Electronics.  On April 12, 2004, Richardson sent Chitron-US a price quotation for these parts.  The price quotation stated that "export or re-export of this commodity may require prior government approval."  (Gov't TX 39.)  Above the signature line (required to complete the purchase), a Richardson employee wrote to Maylyn Atkinson, the buyer for these items: "Hi Maylyn, please note an export licence is required for line 2."

(Id.)  Line 2 of the price quotation is the MAAPGM0034 power
amplifier.  With respect to the typewritten note to Maylyn, there
is no evidence that this message, relayed to Maylyn in a price
quotation, which was not accepted by Chitron-US, was ever relayed
to defendants Wu or Wei through the tasking lists or other
communication.  Defendants were never specifically told that
these items were on the USML.

    While the defendants had notice that the parts were subject
to U.S. export laws, most exports are subject to the Export
Administration Regulations ("EAR") and many do not require a
license.[9]  For example, if an item is designated "EAR 99," it does
not need a license except with respect to certain countries.
Exports with an end point of Hong Kong generally do not require a
license.  See 15 C.F.R. § 732.3.  Although the printed documents
put defendants on notice that the parts may be export-restricted
in some fashion, the printed notices did not provide notification
that a license was required because the article was on the USML,

---

[9] In general, except for items controlled for export by the
Department of State, all items made in the United States are
subject to the Export Administration regulation, see 15 C.F.R. §§
730-774.  The Department of Commerce promulgates the Export
Administration Regulations and maintains the Commerce Control
List, which specifies the goods and technologies that require
export licenses prior to shipment outside of the United States.
Unlike the USML, the Commerce Control List includes the
specifications of every item covered under the List's categories.
Accordingly, exporters and manufacturers need only compare the
specifications shown on an item's data sheet to the
specifications listed in the Commerce Control List to determine
whether a part requires a license.

as opposed to a dual use item controlled by the Department of
Commerce.

Indeed, defendants could not have received a notice that the
amplifiers were on the USML because there had been no
determination by either the manufacturer or the government that
the parts were on the USML until _after_ the export.  The
manufacturer did not provide notice to distributors or
wholesalers that the items were on the USML because it was
disputing that designation.  The evidence shows that M/A Com
self-designated the parts charged in both Counts 2 and 3 as
"dual-use" prior to the date on which defendants exported them to
China.  (Def.'s TX 30 (letter from M/A Com to Department of State
in April 2004 stating that "M/A-COM believes these parts are
properly classified under jurisdiction of the Department of
Commerce"); _see also_ Def.'s TX 37.)  A Commodity Jurisdiction
request was filed on April 27, 2004, _after_ defendants had
exported the items.  (Def.'s TX 30.)  A determination was not
made on jurisdiction until October 2004 due to a jurisdiction
dispute among the interested government agencies.  The Department
of State eventually determined, after the charged exports, that
the MAAPGM0038 and MAAPGM0034 power amplifiers were controlled
under the USML, Category XI(c).  (Def.'s TX 44; _see also_ Gov't TX
614.)

Citing language in _United States v. Murphy_, the government
amplifies its argument that due process is satisfied if

defendants have general notice that a license is required, but are unaware of the particular agency from which they should obtain a license. 852 F.2d 1, 7 (1st Cir. 1988). However, Murphy is a willfulness case. The First Circuit held that in the context of an AECA violation, which is a specific intent crime, willfulness means that a "defendant must know that his conduct in exporting from the United States articles prescribed by the statute is violative of the law." Id. at 7 (internal citations omitted). The First Circuit does note that the government must prove that "the item exported appears on the Munitions List or the Commodity Control List, as the case may be," id. at 7 n.6, but the court did not require the government to prove that the defendant knew that the firearms at issue were on the Munitions List.

Although Murphy does provide the applicable standard for willfulness in this case, its facts are distinguishable and its analysis does not resolve the sticky due process issue here. Murphy does not discuss a case involving items that are not immediately and obviously identifiable as being on the Munitions List. The defendant in Murphy was attempting to export M-16 rifles and perhaps missiles. Moreover, Murphy does not involve a dispute among government agencies over appropriate classification of potential defense articles, or a fact pattern in which the charged parts were retroactively designated as being on the Munitions List. Thus, Murphy's law does not control.

In this case, the defendants had notice that the exported items might require a license under the Department of Commerce's Export Administration Regulations, but had no notice that they might be on the Munitions List and therefore require a license from the Department of State.  Indeed, the question of whether or not the items were on the Munitions List had not yet been resolved by the relevant government agencies.  While evidence of willfulness is closely related to due process issues in the case law, due process is not necessarily satisfied if a defendant has fair notice that a license may be required under one law, but is charged under another law that he had no notice he was violating.

**B.**   **Ex Post Facto Clause**

This issue is further complicated by the fact that the charge is predicated on a retroactively applied interpretation of a regulation.  So, to determine whether defendants had fair notice that the USML applied to the charged exports, the Court must address the challenge to the ex post facto application of the regulatory interpretation.

In the defendants' view, it is "Kafka-esque" to find that they had notice of the fact that they were required to get a license for a defense article when the question of whether or not the particular part was in fact a defense article had not yet been resolved by the Departments of State, Defense, and Commerce.

"[T]o fall within the ex post facto prohibition, two

critical elements must be present: first, the law 'must be retrospective, that is, it must apply to events occurring before its enactment'; and second, 'it must disadvantage the offender affected by it.'" <u>Miller v. Florida</u>, 482 U.S. 423, 430 (1987) (quoting <u>Weaver v. Graham</u>, 450 U.S. 24, 29 (1981)). This clause, although textually directed at the legislature, applies with equal force "to changes in administrative regulations that represent the exercise of delegated authority." <u>Prater v. U.S. Parole Comm'n</u>, 802 F.2d 948, 954 (7th Cir. 1986).

Here, there was no retroactive application of a new regulation, but rather retroactive application of an existing regulation that was unclear. Some circuits have applied a helpful test to determine if agency decisions constitute "laws" for the purpose of the Ex Post Facto Clause. In <u>Stephens v. Thomas</u>, 19 F.3d 498, 500 (10th Cir. 1994), the Tenth Circuit held that "[w]hen a state law has been applied using different interpretations, the proper inquiry in an ex post facto challenge is whether the current interpretation was foreseeable." <u>Id.</u>; <u>but see United States v. Ellen</u>, 961 F.2d 462, 465 (4th Cir. 1992) (holding that the appropriate inquiry in some cases is to determine whether an administrative decision was legislative or interpretive in nature). The court explained that "[t]his analysis comports with the Supreme Court's pronouncement in <u>Weaver</u> that 'lack of fair notice' is a critical element in ex post facto relief." <u>Id.</u> (quoting <u>Weaver v. Graham</u>, 450 U.S. 24,

30 (1981)).  As such, in this context the Ex Post Facto challenge
becomes a metamorphosis of the due process analysis.  The
touchstone for both is whether a defendant had fair notice that
his conduct fell within the scope of the regulation.

The question, then, is whether the Department of State's
retrospective determination that the charged parts in Counts 2
and 3 were on the USML after the date they were exported by
defendants was unforeseeable, and therefore in violation of the
Ex Post Facto Clause and the Due Process Clause.  The regulatory
framework relies on manufacturers, which are required to register
with the Department of State and identify the Munitions List
parts they make under 22 C.F.R. §§ 122.1, 122.2, to "self-
designate" parts as controlled by the Munitions List.  (See also
Davis Tr. 9-10, 30.)  In cases where the manufacturer self-
designates, as was the case for Counts 4 and 5, and passes on
that designation to wholesalers or exporters like Chitron-US,
there is no due process problem.  However, in cases where the
manufacturer believes the part to be "dual-use," and therefore
gives an exporter no notice that the part is on the USML, due
process issues may exist.

In this case, the Department of State did not make a final
determination that the parts charged in Counts 2 and 3 were
controlled under the USML until six months after the defendants
exported the parts.  (Def.'s TX 44.)  The Secretary's
determinations imposed "new rights and duties" on defendants

-28-

after the charged conduct occurred, and those determinations were not subject to challenge by defendants at trial or in any other forum. See United States v. Wu, 680 F. Supp. 2d 287 (D. Mass. 2010) (holding that the Secretary's determinations are not subject to judicial review).

The Secretary's interpretation of the regulation was not reasonably foreseeable. In addition to the fact that M/A Com, the manufacturer, wrongly considered the goods to be "dual-use," and a distributor wrongly sent a notice to that effect, there was a serious dispute between the Department of Defense and the Department of Commerce as to the appropriate classification of the part. Moreover, the Department of State did not immediately see the grounds for the USML determination, but ultimately decided to defer to the Department of Defense. Under the Military Electronics category of the USML, it is more difficult to foresee whether a part falls within the category because items that are "in normal commercial use" are exempted.

In this case, the government argues that the Secretary's post-export determination that the parts in Counts 2 and 3 were on the USML could not have violated the Ex Post Facto Clause because the defendants had the ability to avail themselves of the Commodity Jurisdiction process. Under the case law, this is one factor to be considered where an exporter has fair warning that such an administrative interpretation is a possibility. In this case, though, the government agencies were unable to agree on the

proper jurisdiction of the parts, so an individual exporter should not be reasonably expected to foresee that the part was controlled under the USML.

While the question is close, I conclude that it is fundamentally unfair to find an exporter guilty of failing to obtain a license from the Department of State, where there was no actual notice from the manufacturer or distributor that the part in question would be designated a defense article on the USML, and where it was not self-evident that the part was on the USML at the time of export.  Accordingly, based on the unusual circumstances of this case, the Court vacates defendants' convictions on Counts 2 and 3 as a result of violations of the Due Process and Ex Post Facto Clauses.

## C.  Immigration Conviction

Defendant Yufeng Wei also challenges her conviction on Count 34 of the Third Superseding Indictment for using a fraudulently obtained permanent resident card in violation of 18 U.S.C. § 1546(a).  The main thrust of Wei's argument is that the Indictment charges that she failed to include her employment at Perfect Science & Technology (a predecessor U.S. company to Chitron-US) on her Form G-325A, but that her activities with Perfect Science & Technology did not constitute "employment" under the relevant statutes.  The Court need not reach this thorny question, because the Indictment also alleges an

alternative theory of conduct in violation of Section 1546(a).

The Indictment alleges that "In response to a question on the Form I-485 Application that asked 'Do you intend to engage in the U.S. in any activity to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information?', the defendant responded 'No.'" (Docket No. 123.)  The Court finds that there was sufficient evidence for a jury to convict defendant Wei of using a fraudulently obtained permanent resident card on the basis of her answer to the question of intent to violate the U.S. export laws.  Accordingly, the Court denies Wei's motion for acquittal on Count 34.

## II.  ORDER

The Court **DENIES** defendants' motion to dismiss (Docket No. 161).  The Court **ALLOWS** defendants' motions to set aside the verdict (Docket Nos. 208, 210) as to Counts 2 and 3 and **DENIES** the motion to set aside the verdict as to all other counts of which defendants were convicted.  I **DENY** defendants' motion for a new trial.  Finally, the Court **DENIES** defendant Wei's Motion for Acquittal on Count 34 of the Indictment.


 /s/ PATTI B. SARIS
PATTI B. SARIS
UNITED STATES DISTRICT JUDGE